The **CITY OF MIAMI**, Appellant,

v.

**WESTERN SHIPPING and TRADING COMPANY, Incorporated,**
Appellee.

No. 15685.

United States Court of Appeals
Fifth Circuit.

April 19, 1956.

Rehearing Denied June 7, 1956.

Olavi Hendrickson, Asst. City Atty., Miami, Fla., for appellant.

David W. Walters, Miami, Fla., for appellee.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

CAMERON, Circuit Judge.

Appellant, the City of Miami, Florida, was respondent in the Court below; appellee, Western Shipping and Trading Company, Incorporated, of Curacao, Netherlands West Indies, was libelant. The libel was filed to recover damages done to the S.S. Dodecanese when the north leaf of a drawbridge being operated by the City was permitted to fall on the ship, which had duly signaled for and obtained clearance to pass under the drawbridge.

Appellee claimed in its libel that appellant was liable by reason of the negligent maintenance and operation of the drawbridge, and introduced evidence from which the Court could find that the breaking mechanism was out of order and that appellant had notice thereof when it raised the leaves and signaled the Dodecanese to proceed under the drawbridge. Appellee denied the charges of negligence and also pleaded that it was not liable because the street, including the bridge, had already been conveyed to Dade County, Florida, and that, under the law, maintenance and operation ought to have been performed by the State. The evidence showed, however, that, although the appellant had made earnest effort to induce the State to accept the street and the bridge, acceptance did not take place until several months after the accident; and that the drawbridge was actually being operated by appellant at the time the damages were inflicted.

The Court below entered findings of fact and conclusions of law[1] and adjudged that the vessel had been damaged in its superstructure to the extent of $25,000, awarding an additional amount of $1,775.05 expended in repatriating the crew of the ship. From the judgment entered for the sum of those two figures, the City appealed.

Appellee filed a cross-appeal, claiming that it was entitled to recover its loss of profits arising out of the detention of the ship for settlement of damages and repairs. It was contended that appellant had entered into a charter from which it would derive large profits. The Court below declined to allow anything under that item, finding that "the libelant has failed to carry the burden to prove any loss of anticipated future profits". The correctness of the ruling of

[1] "1. The Court has jurisdiction of the parties and the subject matter.

"2. The libelant was the equitable owner of the S.S. Dodecanese on December 21, 1953, and is entitled to maintain this action.

"3. The respondent operated and maintained the drawbridge over the Miami River at 27th Avenue, in Miami, Florida, on December 21, 1953.

"4. On December 21, 1953, the S.S. Dodecanese was proceeding up the Miami River under tow of two tug boats.

"5. About 12:40 p. m. the towed vessel was passing through the open drawbridge at 27th Avenue. When the vessel was below the bridge, the north leaf of the drawbridge slowly descended upon the vessel, causing damage to the top of the foremast, the deckhouse, and the mainmast.

"6. As a direct and proximate result of the negligent operation and maintenance of the 27th Avenue Bridge by the respondent's employees, the vessel was damaged in the amount of $25,000.00.

"7. The libelant has failed to carry the burden to prove any loss of anticipated future profits.

"8. As a direct and proximate result of the negligence of the respondent's employees, the libelant was required to expend $1,775.05 to repatriate the crew members of the S.S. Dodecanese.

"9. The libelant is due and owing of the respondent the sum of $26,775.05, together with the costs of this action.

"Conclusions of Law.

"1. The libelant should have and recover of the respondent the sum of $26,775.05, with interest from the date of the final decree herein.

"2. The costs of this action should be taxed by the Clerk against the respondent.

"3. A decree should be drawn to conform to these findings and submitted to the Court for signature."

the Court below in the particulars mentioned is involved in this appeal.

The City contends, first, that it is immune from liability to the ship-owner. The contention is not based upon the claim that the City was acting in performance of its governmental functions, cf. City of Tampa v. Easton, 145 Fla. 188, 198 So. 753, but solely upon the claim that the bridge "is part and parcel of the state highway system", and "the State or the State Road Department is the one to whom the appellee should look for recovery of damages", citing Section 341.64 of the Florida Law relating to state roads, 13 Fla.Stat.Ann., Title XXIV, Chapter 341.[2] The street and bridge where the accident occurred had, in 1949, been designated as a state road.

The ship-owner in turn relies upon Section 341.81, Florida Statutes Annotated passed in 1951, Acts 1951, c. 26822, § 1, repealed, Acts 1955, c. 29965, § 167. It is contended that, although that section, in deferring the application of the Florida statutes regulating the running at large of livestock until the actual taking over of a state road, relates to livestock only, the same principle should be applied to all phases of such a transfer from municipalities to state authorities.

The evidence discloses that the City began in 1952 passing resolutions and sending letters to the State Road Department of Florida in an effort to induce the State to take over and maintain the city street involved. But it appears without contradiction that the City was notified in writing that the State Road Department of Florida would not take over the road or the Twenty-seventh Avenue Bridge until April 1, 1952, several months after the accident happened;

and the City officials frankly admitted that its employees did in fact exercise sole control and provide sole maintenance of this street and bridge until that date. Actually, therefore, the City alone was maintaining and operating the bridge at the time of the accident.

This makes inapplicable the case upon which the City relies, Leialoha v. City of Jacksonville, Fla.1953, 64 So.2d 924. That case involved a street already actually taken over and under maintenance and control by the State Road Department. We hold, therefore, that the Court below was correct in deciding that the City could not escape liability on the ground that appellee's claim was not against the City, but against the State of Florida.

The City does not stand upon any firmer ground in its contention that the Court below erroneously found that the accident sued on resulted from the City's negligence. There is little, if any, dispute concerning the facts, all of the evidence of liability being developed from the City's employees.

From the evidence it is clear that the tugs towing the Dodecanese gave proper signals for the opening of the drawbridge, and that the bridge operator responded by blasts of his horn. The witness, Parker, who was operator of the bridge at the time, stated that he applied the power and lifted the two leaves of the bascule type bridge to the proper upright position. As the vessel approached the bridge, the north leaf began to drift downward. The operator tried several times to raise it again by the application of electric power to the lifting mechanism, but he got no response at all. The bridge, therefore, continued to drift

2. This is a portion of the Florida law dealing with highways, bridges and ferries, and invests the state with control and operation over certain highways traversing the cities. The section recognizes that certain city streets, including viaducts and bridges, constitute the route of connection between state roads in the state highway system, and that it is proper that the state undertake and provide the cost of maintenance, repair, and construction thereof. It provides that the state road department shall designate the streets, viaducts and bridges as those which form such connecting links, and the road department is directed and required to maintain and repair such connecting link roads.

downward until it struck the vessel's superstructure and did the damage forming the basis of the libel. According to this witness he was able, soon after the bridge made contact with the ship, to raise it by applying the power, and he did so, moving the bridge up and down so that the ship might be extricated. No explanation was offered as to why the power failed during the brief interim.

The bridge operator testified further that the operator on the preceding shift had told him, when he reported for work that morning, that something was wrong with the brakes, that they were weak and that he had "better not trust the brakes too much". Between the time the operator received his notice that the brakes were defective and the time of the accident, a crew of City maintenance mechanics, headed by the acting superintendent, were engaged in making repairs. During that period, they were present when the drawbridge was lifted to let a ship by and observed that the brakes were not holding and that the operator had to continue applying power to lift the drifting leaf back to upright position. The brakes were of a type which, when functioning properly, held the bridge automatically in position whenever the application of power was suspended. In the event of power failure, therefore, the brakes would lock the bridge leaves in whatever position they were at the time of such failure.

The City's superintendent of maintenance testified, with the help of the bridge log, that three days prior to the accident there had been a similar brake failure. The acting superintendent testified that, shortly before the time of the accident, he had departed from the bridge after removing a portion of a switch and in order to obtain a replacement therefor. During the period of the absence of the switch, the two wires normally separated by it were joined together with friction tape. These undisputed facts disclosed clear negligence on the part of the City in lifting the bridge and signaling the Dodecanese to proceed under it when it knew that the brakes were not functioning properly. The application of power to lift the drifting bridge back to position was a mere secondary expedient and in no way took the place of the brakes which were designed to lock the bridge automatically in event of power failure.[3] Appellant cites no law at all in support of its contention of non-negligence, and we assume that none could be found on so plain a proposition.

The third claim made by the City is that the Court below erred in awarding damages based upon the cost of repair of the damaged ship rather than upon the theory of total loss. It claims to have introduced testimony that the ship was not worth as much as $25,000 before the accident, and that it was error for the Court to award damages in excess of the value of the ship so established. The two cases cited to sustain that position[4] fail to support it. But assuming that this contention is based upon a correct legal premise, the Court below evidently did not accept the testimony upon which the City relies, but found the testimony of the ship-owner and its witnesses more credible.

Several witnesses testified that the cost of repairs to the ship would exceed $25,000. One of these witnesses introduced by appellee had been employed by the City as an expert to estimate the amount of the damages, and had rendered the City an estimate well in excess of that amount. Indeed, the City does not claim in its brief that there was not ample evidence to sustain the finding that the damages exceeded the $25,000 allowed by the Court below. And it con-

3. Cf. General Chemical Co. v. Atlantic Refining Co., D.C.E.D.Pa.1925, 3 F.2d 1011; Staub v. Delaware Dredging Co., D.C.E.D.Pa.1930, 38 F.2d 844; and Eastern S.S. Corp. v. City of Chicago, 7 Cir., 1931, 47 F.2d 1017.

4. Zeller Marine Corp. v. Nessa Corp., 2 Cir., 1948, 166 F.2d 32, and The Pocahontas, 2 Cir., 1940, 109 F.2d 929.

cedes in its brief that the allowance of $1,775.05 covering repatriation of the ship's crew was reasonable and proper.

■ The City introduced in evidence and has exhibited before us a large number of photographs made of various portions of the vessel, which tend to show that the separate parts photographed were not in good condition. On the other hand, there was credible evidence on the part of the shipowner that certificates of seaworthiness had been issued by the Bureau Veritas and by Lloyds of London; that the vessel was purchased in May, 1953, seven months before the accident at a price of $55,000 and that extensive repairs had been made since its purchase. The general rule governing the measure of damages is thus stated in Pan American Petroleum & Transport Co. v. United States, 2 Cir., 1928, 27 F.2d 684, 685: "Strictly the measure of damages in collision is the difference in value between the ship before and after the collision, but the cost of the necessary repairs and the loss of earnings while they are being made have long been regarded as its equivalent. As to the loss of earnings, it may be that the owner makes a prima facie case when he proves his actual loss by reason of the lay-up." And the rule as stated by this Court [5] is this: "The maxim 'Restitutio in integrum,' applies in awarding damages in collision cases, and there is no doubt that the owner of a vessel may recover as damages an amount necessary to restore her to her condition before the accident, whether the repairs are actually made or not, if the value of the vessel is thereby decreased."

■ We find no evidence that the Court below applied the wrong measure of damages and further that there was ample testimony to sustain its findings that the Dodecanese was damaged to the extent of $25,000.

The libelant claimed damages based upon the fact that the vessel was put out of service and, by reason thereof, charter commitments could not be fulfilled which, it was averred, resulted in loss of profits from the operation of the vessel to the extent of $45,000.00. Quite a bit of evidence was received touching this item of damage. It was shown that the vessel was brought to Miami December 6th, and that repairs had been made aggregating $2,000.00. At the time the damage was sustained the vessel was being moved upriver for the purpose of applying two new plates to its hull, which could be accomplished in about two weeks.

Through its agent, libelant had entered into a charter dated December 7th with St. Johns Terminal Company, Inc., of Jacksonville, Florida, for two consecutive voyages from Miami to Cayenne, French Guiana, and thence upriver to Boulanger Mine Site. Libelant was to be paid $11,000.00 on each southbound cargo and the Terminal Company agreed in the charter to furnish a "full or part return cargo, not less than fifty percent of vessel's capacity", to consist of logs at $40.00 per MF.I.O., to be discharged at Jacksonville, Florida, the loading and discharge to be performed at the expense of the Terminal Company. An advance of $1,000.00 was made on this charter, and the president of the Terminal Company testified that it was ready, willing and able to perform the charter.

The vessel's captain testified that the first round trip would consume about thirty-six days and would yield a net profit of something over $18,000.00 not considering depreciation. The charter would have been performed except for the accident. One of the provisions of the charter was that, if the vessel should be detained by reason of any default of the Terminal Company, demurrage at the rate of $500.00 per day should be paid.

5. Streckfus Steamboat Line v. United States, 5 Cir., 1928, 27 F.2d 251, 252; and to the same effect see Eagle Transport Co. v. United States, and reverse title, 2 Cir., 1940, 109 F.2d 929, 931; and Zeller Marine Corp. v. Nessa Corp., 2 Cir., 1948, 166 F.2d 32, 34.

Some testimony on behalf of the City tended to show that the vessel was not in seaworthy condition, and to give support to the inference that the charter could not have been performed without extensive repairs. The parties to the charter seemed convinced to the contrary and this position was supported by the certificates of seaworthiness as well as the voyage already completed. The Court below made only this short finding with respect to losses accruing subsequent to the time the vessel was damaged: "The libelant has failed to carry the burden to prove any loss of anticipated future profits." It is difficult to understand the basis for this finding in view of the evidence outlined, and it is difficult to justify the failure to award libelant any damages at all growing out of the undisputed facts that the vessel was put out of commission solely by the City's negligence, and that a charter for its employment was actually in existence.

■ We feel that the total disallowance of any such damages should be disapproved, and that the Court below should, upon the record already made, or after hearing further evidence and argument if it so decides, enter more detailed findings with respect to these damages under the legal standards now discussed.

■ Such damages, if properly established, are recoverable under a long line of court decisions. In The Conqueror, 1897, 166 U.S. 110, 125, 17 S.Ct. 510, 516, 41 L.Ed. 937, the Supreme Court thus epitomized the rule: "That the loss of profits or of the use of a vessel pending repairs, or other detention, arising from a collision or other maritime tort, and commonly spoken of as 'demurrage,' is a proper element of damage, is too well settled both in England and America to be open to question. It is equally well settled, however, that demurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty. * * * 'It does not follow, as a matter of necessity, that anything is due for the detention of a vessel while under repair. Under some circumstances, undoubtedly, such a consequence will follow, as, for example, where a fishing voyage is lost, or where the vessel would have been beneficially employed.' "

Again, in The Umbria, 1897, 166 U.S. 404, 421, 17 S.Ct. 610, 617, 41 L.Ed. 1053, the Supreme Court said: "The probable net profits of a charter may be considered in cases of delay occasioned by a partial loss, where the question is as to the value of the use of the vessel pending her repairs. In such cases the net profits of a charter which she would have performed except for the delay may be treated as a basis for estimating the value of her use. [Citing cases.]" Again, in Brooklyn Eastern District Terminal v. United States, 1932, 287 U.S. 170, 174–176, 53 S.Ct. 103, 104, 77 L.Ed. 240, the Supreme Court spoke of the yardstick which should be applied in assessing such damages: "The disability of a vessel will not sustain demurrage at the rate of the value of her hire unless an award at such a rate can be seen to be reasonable when the disability is viewed in the setting of the circumstances. The Conqueror, supra. Only when thus enlightened can we choose the yardstick most nicely adjusted to be a measure of reparation, in some instances, no doubt, the hire of another vessel, in other instances, it may be, a return upon the idle capital * * *, in others something else. Only then indeed can we know whether the interference with profit or enjoyment is to be ranked as substance or as shadow. * * * We are to have regard in every case to the reasonable probabilities of time and place and circumstance."

This Court has had occasion to consider damages of this nature in two cases worthy of note. In The El Monte (The Clematis), 5 Cir., 1918, 252 F. 59, 64, we upheld an item of damages based upon the rate of demurrage fixed by a charter providing the rate for detention (in this case this rate was fixed at $500.00 per day): "The decree awarded

to the owner of the Clematis * * * the amount of damages which the court ascertained were caused by the collision, with interest thereon at 6 per centum per annum from the date of the collision. Complaint is made of some of the items allowed. As a result of the collision the Clematis was detained at Galveston, undergoing repairs * .* *. The court allowed for 40 days' detention * * * at the charter rate for demurrage, £ 150 per day. This allowance at that rate is not fairly subject to complaint, as the evidence adduced indicated that, under the conditions existing at the time of the collision and during the period of the detention, the owner could have realized more for the use of the vessel, if it had been available, than was awarded for the period of detention. It is well settled that the loss of profits, or of the use of a vessel, pending repairs, or other detention, arising from a collision, is a proper element of damage. [Citing cases.]"

Finally, in The Nicolaou Maria (The Nidarholm), 5 Cir., 1944, 143 F.2d 406, 407, we held the proof of loss of profits to be insufficient. "The allowance of demurrage for loss of the use of a commercial vessel pending repairs arising from a collision depends upon whether profits actually have been, or reasonably may be supposed to have been, lost. Detention alone does not entitle an owner to demurrage; it must be shown with reasonable certainty that the vessel would have been employed if she had been in good repair. The burden of establishing that profits were lost was upon the owners of the Nidarholm. We find no such proof in the record." [6]

These principles of law will serve to define the legal boundaries which should guide the lower Court in considering further whether some allowance should not be made for this detention. The evidence on the subject seems persuasive enough to call for a rehearing of this item by the Court below and a detailed findings of fact and conclusions of law dealing with the evidence which the Court below may consider on the subject. Rule 52, Fed.Rules Civ.Proc. 28 U.S.C.A.

For the reasons stated, the judgment of the Court below is affirmed on direct appeal and is reversed on cross-appeal and remanded for further proceedings in conformity with this opinion.

Affirmed in part and reversed in part and remanded.

6. See, also Cuyamel Fruit Co. v. Nedland, 5 Cir., 1927, 19 F.2d 489, 493, in which we denied recovery of profits where it appeared that the owner of the vessel refused to enter into a charter during the period necessary for repairs. And see also Sinclair Refining Co. v. The American Sun, 2 Cir., 1951, 188 F.2d 64, and The Gylfe v. The Trujillo, 2 Cir., 1954, 209 F.2d 386.