CHARLES ZUBIK & SONS, INC., Libellant,

v.

The OHIO RIVER COMPANY, Respondent.

No. 386.

United States District Court W. D. Pennsylvania.

June 27, 1962.

Alexander C. Sherrard and Marten R. Jenkins, Pittsburgh, Pa., for libellant.

Thorp, Reed & Armstrong, Clyde W. Armstrong, Pittsburgh, Pa., for respondent.

ROSENBERG, District Judge.

This case comes before this court in admiralty, as a result of a collision on May 17, 1960, on the Ohio River between a boat going downstream pushing thirteen coal loaded and seven unloaded barges, and a stationary seven-piece dredging operation.

It is based upon a libel and cross-libel for damages to marine equipment resulting from the collision. Charles Zubik & Sons, Inc., libellant, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business at Pittsburgh, engaged in general river business, including that of dredging operations. The Ohio River Company, respondent, is a corporation organized under the laws of the State of West Virginia, and at the times herein material maintained a place of business at Pittsburgh. The court has jurisdiction over the parties and the cause of action in admiralty.

Much conflicting or contradictory testimony was offered by the parties as to the cause of the accident and of the negligence of the parties. And after hearing the testimony of the witnesses and receiving the exhibits, after observing the witnesses and their demeanor while testifying upon the stand, and after a careful review of the testimony and exhibits and the inferences to be drawn therefrom, it is my considered judgment from the fair preponderance of all the credible evidence in this case, that both the libellant and the respondent were guilty of negligence in the causation of the accident which is the subject matter of this case.

The collision occurred at a point approximately 65.5 miles from Pittsburgh, where the libellant was engaged in a dredging operation at a place approximately 1,000 feet to one-quarter of a mile below the visible point in a horseshoe bend curving to the left at the place known as Cable's Eddy. The river moving downstream is bounded in this area on the left side by the State of West Virginia, and on the right side by the State of Ohio. At the inside of the curve on the West Virginia river bank and to the left going downstream, a steep cliff rises from the river bank which obstructs the visibility around the bend of those approaching on the river from the opposite direction.

The navigation channel, proceeding down river, after passing the mid point of the bend at Cable's Eddy, favors the Ohio or right hand shore. On the Ohio shore of the bend is the Steubenville

Water Works, and a creek known as Will's Creek. The outflow of this creek creates a sandbar which extends into the river from the Ohio shore and constitutes an obstacle to downstream vessels maneuvering the bend.

On the particular morning the respondent's boat, the Charles R. Stevenson, was moving ahead of it twenty standard steel hopper barges arranged four wide and five deep, thirteen of which were loaded with coal and seven of which were empty. The overall length of the respondent's equipment was 1,000 feet. The barge length in front of the Stevenson was 875 feet to the head thereof.

Prior to moving into the bend, the Captain put in two radio calls to Lock No. 10 for the purpose of ascertaining whether or not there was anything ahead. He received no response to these calls. He then put in a general security call for any boat in the vicinity of Lock No. 10. A response came to this call from the Kanawha just as the Captain of the Stevenson had come around the curve and had seen the libellant's equipment about one-quarter of a mile ahead, but too late for the avoidance of the collision.

Prior to moving into the bend, the Stevenson's Captain also blew a bend whistle made up of three long, distinct blasts. Not hearing any response signals from further downstream and around the bend, the Stevenson's Captain began to maneuver into flanking movement to take advantage of the current and river channel in pushing around the bend and beyond it, and to also avoid the sandbar. In doing so, he moved the line of equipment into a 45° angle which brought the Stevenson over the center of the river towards the West Virginia side. However, the Stevenson's Captain had not reckoned on the libellant's dredging equipment being beyond the bend where he first saw it from his pilot's cabin at a distance of a quarter of a mile away. When he did see it, he knew he was in trouble.

The libellant's equipment was spudded down at a place in the river approximately 3,000 feet above Lock No. 10 and approximately 400 to 500 feet upstream from the uppermost mooring cell or ice breaker owned by Scarvaggi Industries. Libellant's equipment extended out from the West Virginia shore at a point where the Ohio River is approximately 1100 feet wide.

When the Stevenson's Captain had his engine partially in reverse during the flanking maneuver, he had been with the current at its speed of seven miles per hour. Upon sighting the libellant's equipment, the Captain ordered his engines into complete reverse. However, all of this proved unavailing under all the circumstances for the prevention of the collision which the Captain knew was imminent.

In the meantime and after the respondent's barges had rounded the bend, the libellant's pilot, who had been walking forward on the Zubik's head, observed the Stevenson tow approaching at an angle, about 1,000 feet from the Zubik fleet and anticipated the obvious danger of a collision because of the high water and current.

He did not sound any warning either to the moving respondent's fleet or to his own crew, but from his position where he first saw the Stevenson, he ran down to the galley where he vocally informed them of the danger, and then went to start the Zubik engines. When he returned to the Zubik deck, he saw the respondent's barges only 200 feet away, and then sounded his warning to the respondent's crew, but too late for anything to be done in the avoidance of the collision.

Two impacts followed between the Stevenson barges and the Zubik fleet. The first impact was with the center of the second barge from the head of the Stevenson tow and the corner of libellant's ¾" gravel barge, and the second impact was with the fourth coupling from the head of the respondent's tow and the upstream corner of the derrick boat. The first impact sheared the lines and rigging of the gravel barge and caused it to break away from the rest of the fleet. The second impact broke the lines

of the derrick boat and caused it to swing out into the river.

The respondent's fleet continued to move downstream, but its Captain put in a call for help in order to stop the runaway gravel barge belonging to the libellant. The call was heard by the Kanawha which retrieved the barge and eventually brought it back to the Zubik fleet.

■ During the maneuvering by the respondent's fleet, no look-out had been placed on the head barge, although men had been sent there to sweep the deck, and nothing more. They performed as instructed and maintained no look-out. The libellant's fleet and its crew appeared to be in a state of inactivity as of the time immediately prior to the occurrence of the collision. It was lunch time for part of the crew, and none of the equipment was operating.

The river at Cable's Eddy curve or bend is one of the worst places in the Ohio River by reason of the current and the sandbar. In this area, it is not possible for two opposite moving pieces of equipment to pass each other. A fleet of thirteen coal loaded and seven empty barges, of the length and width of the respondent's moving in the river at that particular place and time, was an unwieldy and an unusually heavy burden and required unusual precautions throughout its entire operation, before, while and after negotiating the bend. It is evident that the Stevenson Captain did not anticipate or take into consideration the possible presence of the dredging equipment beyond the bend. While he received no radio response from Lock No. 10 his third radio call was placed too late and received too late from the Kanawha, when he was told of the position of the dredging equipment.

It therefore appeared that the Stevenson's Captain maneuvered his fleet on this day as he had performed once a week on the many previous occasions, as a matter of routine and without that due care which was required of him, as a prudent person under the circumstances. This was made obvious by the very fact that men were sent forward "to sweep" the head barge, but no thought or instructions were given "to look" during this short and crucial time. Certainly, with a barge line of close to 900 feet of length and more than 100 feet in width in front of him, and with such dangerous conditions of the current and sandbar in the river, where there was no visibility around the bend, a watchman should have been placed and instructed on the head barge as a look-out for any possible conditions, dangers or hazards ahead in the river, and when there were men already there and available—and no thoughts given to these—the inference is plain.

■ The respondent's failure to control the Stevenson and her tow before, during and after the maneuvering around the bend, was in the court's opinion done with carelessness and negligence. The Oregon, 158 U.S. 186, 196, 15 S.Ct. 804, 39 L.Ed. 943 (1894). There was a heavy burden imposed upon the respondent's pilot to be aware of all conditions which existed in the river as of any time. Particularly was this true with the heavy load of unwieldy barges which he was required to maneuver under these circumstances. It was incumbent upon him to be constantly informed of the changes in the current of the river and the changes made by the hand of man. Davidson Steamship Co. v. U. S., 205 U.S. 187, 194, 27 S.Ct. 480, 51 L.Ed. 764 (1907). It was aptly stated in Utility Service Corporation v. Hillman Transportation Company, 3 Cir., 244 F.2d 121. At page 124:

"Rivers are not immutable. Rains swell their volume; the opening of dams increase their current; deposits of silt may change their depths; wrecks may obstruct them. Where the river pilot has the means of obtaining information concerning these changes, he is deemed in law to know them. If he tests the danger of the increased current at a place where his common sense and nature's physical laws would tell him that a crosscurrent would embarrass

his progress, he does so at his own risk."

Under these circumstances, the respondent must be held to be guilty of negligence which contributed to the collision in this case.

The libellant, too, failed to use that care which was required of it under the circumstances. While the libellant's testimony was to the effect that its equipment extended 220 feet out from the West Virginia side, at a place where the river is approximately 1100 feet wide, and while it is true that at the point of collision, the respondent's boat was over on the left side of the center of the river, it is difficult to believe from all the evidence in the case that the libellant's dredging equipment extended out only 220 feet from the West Virginia river bank, and did not extend to a point much closer to the center of the river, at a place where a collision would be likely to occur with vessels in navigation. 33 U.S.C. § 409.

■ While the respondent's Captain was held to a heavy burden of knowing the conditions of the river, the libellant was no less held to the same burden of knowing the river conditions, and particularly as they related to its anchored position for its operation. The libellant knew, or should have known when it placed its equipment at a place only 1,000 feet below the bend of the river, of the conditions which existed at the bend and of the possibility of the presence of a boat and tow like that of the respondent engaging in a flanking movement. Even more significant, however, is the fact that the pilot of the Zubik fleet became aware of the possibility of a collision because of the high water and stronger current, when he observed the position of the Stevenson and her tow 1,000 feet away from his own fleet.

The Zubik pilot's action which followed and the warning blast to the Stevenson were as good as nothing. While the placement of the Zubik operation required a proper consideration for all the conditions which existed in that area on the river, a failure to provide the care required under the circumstances would in itself constitute negligence. It would certainly be the act of a prudent person to maintain an efficient look-out under these circumstances. The evidence does not support the fact that there was an efficient look-out on the Zubik fleet at the time prior to and at the time of the collision.

The libellant was, therefore, guilty of negligence in contributing to the cause of the collision.

■ By the preponderance of all the evidence in this case, the court concludes that both the libellant and the defendant were equally guilty of negligence in causing the collision and the damages resulting therefrom. Accordingly, the damages hereinafter discussed will be divided equally. The Pennsylvania, 86 U.S. 125, 22 L.Ed. 148 (1873); Tank Barge Hygrade, Inc. v. The Gatco New Jersey, 250 F.2d 485 (3rd Cir. 1958).

Both parties to this action sustained damages to marine equipment either owned or leased by them, and both parties have claims. Libellant's damages are set forth in three items: (1) repairs to the equipment; (2) loss of profits because of deprived use of sand digger for three days; and (3) loss of use of M/V James Zubik, a tow boat, for three days. Libellant's exhibits 10 and 11, which were presented in evidence, subject to objection, present a summary of the damages alleged to have been sustained. This summary includes estimates for insurance and labor, as well as an item for overhead expenses. Libellant's witness, Virginia Drambel, testified that all of the items listed in the summary were determined in the ordinary course of the libellant's business and that the charges for labor and insurance, as well as overhead, were common business expenses. The court believes that respondent's objections went to the weight of libellant's exhibits rather than to their admissibility. The court does believe the proof could have been more precise, but respondent has offered no evidence to show that the figures submitted are unreason-

able, nor does the respondent deny the damages were caused by this collision, even though minor repairs were performed during the three days following the accident and the major repairs were made months later when the fleet returned to Pittsburgh for the winter. Under the circumstances, while the weight of the libellant's evidence could have been more impressive, the exhibits are not without meaning and are a guide to the court, especially in the absence of any substantial evidence to impugn the reliability of the figures presented.

The court concludes that the first item for the repairs to libellant's equipment in the amount of $8,077.92, ought to be and will be allowed.

■ The second and third items of damages submitted by libellant, merit separate consideration in view of respondent's strenuous objections—three days loss for the M/V James Zubik at $35.00 per hour, totalling $2,520.00, and three days loss for the sand digger and miscellaneous items in the amount of $1500.00. The latter item is one for demurrage, that is, loss of profits pending repairs resulting from the collision.

On the issue of demurrage, there was no evidence of the business records of libellant, but there was uncontroverted oral testimony that the Zubik fleet averaged 1200 tons of sand and gravel daily, and that an equal amount of both was obtained. Sand brought $1.90 per ton at Pittsburgh and gravel brought $1.40 in May, 1960. It was stated that it cost $.40 per ton to ship the sand and gravel to Pittsburgh from mile 65.5 on the Ohio River.

■ Respondent's objection is based on the fact that the market price less cost of shipping is not a sufficient indication upon which loss of profits can be determined. This objection is well founded. There is no evidence as to how the figure of $.40 was determined, but even more important is the absence of any testimony relating to cost of production. Certainly charter fee, labor costs, maintenance and repair costs and similar items should have been accounted for as production costs. The court cannot guess what the loss of profits might have been without these, since it is only logical that production costs and transportation costs deducted from the selling price at the place of marketing show the profits. It is clear also that demurrage can only be allowed when profits have actually been lost or may reasonably be supposed to have been lost, and the amount proven with reasonable certainty, The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1896). This has not been done in this instance.

■ Libellant's claim for the loss of the use of the M/V James Zubik for three days presents a similar problem. The charter agreements do not itemize the charter fee which libellant was compelled to pay for any particular equipment, and the court was offered no evidence as to what a reasonable fee might be for the use of the M/V James Zubik without the crew, although the libellant's bookkeeper, Mrs. Drambel, said a reasonable fee in the industry with a crew would have been $40.00 per hour. It was clear that libellant's crew was busy with repairs and would not have been available for hire with the boat. Her estimate of $35.00 per hour was not based upon any facts before the court. Evidence of the boat's worth would have been her charter fee, but none was produced. Nor is there any evidence that libellant was in the business of leasing equipment or that there was any market for the M/V James Zubik during the three days she remained idle. The loss of the use of the Zubik must have been included as demurrage or loss of profits, in the second item of damages and would, therefore, constitute a duplication in damages. How is the court to separate such possible conflicts without credible evidence? There is not such clear evidence before the court, which satisfies it that either or any part of the claims presented under the second and third items should be allowed. They are accordingly disallowed.

The respondent has offered sufficient and credible evidence of its damages, including the charter fees required to be paid by respondent, and the court finds as a fact that the respondent sustained the following damages to marine equipment or equipment chartered by it:

1. Repairs to barge OR 513   $ 519.01
2. Repairs to barge AVC 703   424.76
3. Laytime for barge OR 513   75.00
4. Administrative charges for barge AVC 703   53.10
5. Three lay days for AVC 703   60.00

          TOTAL:   $1131.87

An equal division of the damages requires that libellant be compensated for one-half of its total damages, or $4,038.-96, less a one-half share of the damages sustained by the respondent, or $565.93. Accordingly, judgment will be entered for the libellant and against the respondent in the amount of $3,473.03.

This opinion includes both findings of fact and conclusions of law.