**Ove SKOU, Plaintiff-Appellee,**

**v.**

**UNITED STATES of America, Defendant-Appellant.**

**No. 72–3216.**

United States Court of Appeals, Fifth Circuit.

May 17, 1973.

John L. Briggs, U. S. Atty., Tampa, Fla., Alfred H. O. Boudreau, Jr., Walter H. Fleischer, Eric Chaikin, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for defendant-appellant.

Nathaniel G. W. Pieper, Tampa, Fla., for plaintiff-appellee.

Before WISDOM, GEWIN and COLEMAN, Circuit Judges.

WISDOM, Circuit Judge:

In this suit a shipowner seeks damages for the loss of use of its ship while undergoing repairs. The United States admits that it negligently damaged the ship M/V MADS SKOU. As a result, the ship was out of service for ten and five-twelfths days. The district court awarded the shipowner damages equal to the amount a charterer would have paid in rental for the days the ship was laid up for repairs. On appeal, the United States alleges two errors in this award. First, the court did not require the shipowner to prove that he could have subsequently chartered his vessel had it not been for the detention. Second, even if detention per se justifies dámages, without proof of actual loss of a charter, the district court erred in making an award of the full rental value of the ship rather than subtracting operating expenses to determine a net profit award. We reverse the district court's award of damages for detention and remand to allow the shipowner to prove actual loss of profits or that profits may be reasonably supposed to have been lost because the vessel was active in a ready market. We conclude that once actual loss has been proved, the operating expenses which have been saved by the shipowner must be deducted from the rental value of the ship to determine damages.

I.

On May 10, 1969, while the M/V MADS SKOU was being maneuvered away from its dock site, a United States Army tug assisting the maneuver negligently struck and damaged the MADS SKOU. Ten and five-twelfths days were required to repair the ship. Afterwards the ship completed its interrupted charter voyage and the shipowner was paid the full contract price by the charterer. The ship was not employed until fourteen days after completion of that charter.

The ship was valued at approximately two and a half million dollars. At the time of the accident it was under charter to Harrison Lines at a per diem rate of $1750. By the terms of the charter, payment of the per diem rate was suspended while the ship was in repair.

The shipowner was reimbursed in full for the cost of the repairs and for services incidental to completing the repairs.[1] For the ten and five-twelfths days that the vessel was out of service, the shipowner was awarded $1750 per day for a total of $18,229. This was exactly the gross charter hire being paid by Harrison Lines. The court concluded that this amount was the "market price for the use of the vessel" during "May and June 1970". Because that was the charter price at the time of the collision, the district court held that it was "reasonable evidence of the market value and the shipowner's expected return on its capital investment." There were no deductions made for the ordinary expenses that the shipowner would incur during a charter. During charter periods, the shipowner ordinarily bore the expenses of wages and provisions for the crew, though the cost of fuel was borne by the

---

1. The shipowner received a total award of $51,885.12 plus 4% interest, of which only $18,229 is in dispute here. Uncontested awards include expenses for stevedoring, pilotage, repairs, harbor fees, local agent fees, crew overtime, and fuel during the detention.

charterer. Because the ship was damaged while in mid-performance of a charter the ship maintained a crew during the repairs.

## II.

The United States argues that the district court erroneously awarded $18,229 to the shipowner without requiring any proof of actual loss. The shipowner introduced no evidence that a specific charter had been lost because of the ten day delay, nor did he offer proof that the ship would probably have been chartered had it arrived on schedule at its destination port. The government contends that to justify an award of damages for loss of use the shipowner must introduce some evidence that profits actually have been, or reasonably have been, lost. The shipowner contends that evidence of the market price of the vessel is sufficient proof of loss, and that he is entitled to a fair return on his capital investment.

Demurrage, loss of profits from the loss of use of a vessel, has traditionally been an item of damages in admiralty. Demurrage, "will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proved with reasonable certainty." The Conqueror, 1898, 166 U.S. 110, 115, 17 S.Ct. 510, 512, 41 L.Ed. 937, 944; The Nicolaou Maria, 5 Cir. 1944, 143 F. 2d 406; The Wolsum, 5 Cir. 1926, 15 F. 2d 371, 377. "The damages must not be merely speculative, and something else must be shown than the simple fact that the vessel was laid up for repairs." The Conqueror, 166 U.S. at 127, 17 S.Ct. at 517. Navigazione Libera T.S.A. v. Newton Creek Towing Co., 2 Cir. 1938, 98 F.2d 694. The burden of establishing that profits were lost is upon the shipowner. The Nicolaou Maria; Newton Creek Towing Co. v. City of New York, 2 Cir. 1928, 23 F.2d 486. In the *Nicolaou Maria* because no evidence was introduced of the demand for similar vessels and because the vessel was not chartered in the succeeding three weeks, the court concluded that an award of demurrage would rest only upon surmise and speculation.[2]

Damages for demurrage have been awarded where actual loss has been proven. In the Steamboat Potomac v. Cannon, 1882, 105 U.S. 630, 26 L.Ed. 1194, the vessel was a steamboat "engaged in a certain, permanent, and lucrative trade, making weekly trips on the Mississippi River. . . ." Because the vessel was engaged in a "regular established line", the shipowner was awarded her average net profits for the period during repairs. In the City of Miami v. Western Shipping and Trading Co., 5 Cir. 1956, 232 F.2d 847, where the necessity for repairs caused the vessel to breach existing charter commitments, unlike the situation with the MADS SKOU, damages were also awarded for the actual loss. There, however, the court stated: "Quite a bit of evidence was received touching this item of damage." *Id.* at 851. In the Hygrade No. 24 v. The Dynamic, 2 Cir. 1956, 233 F. 2d 444, a barge was inoperative for nineteen days. The court awarded the owner the net profits it would have earned for each of those days after finding that the barge was booked continuously for the entire season and that the evidence was sufficient to conclude that the barge would have worked every day had it not been damaged. *Id.* at 448. Similarly, in Atkins v. Alabama Drydock & Shipbuilding Co., 1960, S.D.Ala., 195 F.Supp. 944, an award of demurrage was based on a finding that the vessel was engaged in routine repeated runs

2. The Nicolaou Maria arrived in port seven days late. A subsequent charter was frustrated by the German invasion of Denmark. After three weeks without a charter, the vessel returned to the United States without cargo. No evidence was introduced to show that the Danish charter could have been completed had the vessel arrived timely.

from British Honduras with a banana cargo.[3]

The dearth of evidence here prevents our concluding whether, during the market of May and June 1969, vessels of the Skou's tonnage and design were customarily under charter every day of the year, whether there were lengthy inactive periods between charters, or whether actual experience was somewhere in between. The ship in question arrived at its destination ten days late and was not rechartered until fourteen days later, or 24 days from its original scheduled arrival date. There is no evidence that a subsequent charter commitment was breached, or that the shipowner, knowing the approximate length of the repair period, made any attempt to arrange for a subsequent charter. If the ship was in fact idle for only a customary period, then compensation of the shipowner for these inactive days would be a windfall to him. He would be in a better position because of the collision than had it not occurred. To profit by one's loss goes against the purposes of compensatory awards in tort and exceeds the doctrine of *restitutio in integrum*.

The requirement that a shipowner offer proof of loss is not equivalent to a requirement that he prove the loss of a specific charter at a definite time and place. Other courts have demanded only that the vessel be "active in a ready market", Moore-McCormack Lines v. The Esso Camden, 2 Cir. 1957, 244 F.2d 198, 201, or that there be a "steady demand in the market." The Conqueror, 166 U.S. at 134, 17 S.Ct. 510. In The North Star, 2 Cir. 1907, 151 F. 168, 175, the court discussed the burden of proof in the following terms:

In ascertaining whether earnings have been lost by the owner, the inquiry is not whether they could possibly have been made, but is whether they would have been made. As it cannot be proved that they would have been certainly made, it suffices if the fact [of lost profits] is proved circumstantially and with a reasonable degree of certainty. . . . It is not necessary for him to show by direct evidence that he would have employed his vessel . . . during the period in such a way that earnings would have accrued to him. . . . It suffices if he shows a state of facts from which a court or jury can find that there was an opportunity for him to do so, and that he would have availed himself of it. But if it appears affirmatively, or if the reasonable inference from the facts established is that there was no opportunity . . ., it is impossible for a court or jury to find legitimately that he has sustained actual loss."

The shipowner commended this test to us but even the burden of proof as set forth in *The North Star* has not been met.[4]

The sole evidence introduced was the per diem rate at the time of the detention. That evidence does not reflect upon the existence of a market, only upon the price when a market is found. Every commodity has its cost, but the mere quotation of a market price in no way informs us of the quantity or with what frequency the commodity is being purchased. Demand is not always constant for all suppliers available. Without proof of actual loss the legal liability imposed upon the defendant is in the nature of damages for a technical legal invasion, similar to punitive damages awarded in conjunction with nominal damages.

3. See also Charles Zubik and Sons, Inc. v. The Ohio River Co., 1962, W.D.Penn., 208 F.Supp. 71, where the court concluded: "Nor is there any evidence . . . that there was any market for the M/V James Zubik during the three days she remained idle." *Id.* at 76.

4. With respect to subsequent charter opportunities the trial court remarked: "But if [the MADS SKOU] had gotten there on time I don't know what would have happened." Trial transcript, p. 281.

The burden of proof on the shipowner is not excessive. He need prove only that profits "have actually been or may be reasonably supposed to have been lost." The Conqueror, 166 U.S. at 125, 17 S.Ct. at 516. Counsel for the plaintiff admitted on oral argument that he could have introduced expert evidence of the ship's marketability. We remand this case to the district court to give the plaintiff an opportunity to introduce evidence of actual loss, and we leave to the district court the factual determination whether such evidence is sufficient to satisfy the shipowner's burden of proof. *Cf.* Brooklyn Eastern District Terminal v. United States of America, 1932, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240.

This Court's decisions in Continental Oil Co. v. S.S. Electra, 5 Cir. 1970, 431 F.2d 391, and Delta Marine Drilling Co. v. M/V Baroid Ranger, 5 Cir. 1972, 454 F.2d 128, are not contrary to the rule we have adopted. In both of those cases the plaintiff was employed to perform work under a continuing contract of indefinite duration at a daily rate. The facts there are analogous to the regularly scheduled voyages of the THE POTOMAC. See The Steamboat Potomac v. Cannon, 105 U.S. 630, 26 L.Ed. 1194. The drilling platform in *Continental Oil* and the drilling barge in *Delta Marine* were not engaged in irregular unscheduled short term contracts such as the MADS SKOU. Their contracts were for continuous long term performance.

### III.

The appellant next contends that the trial court erroneously awarded the shipowner the full charter price for the ten day detention without deducting the operating expenses ordinarily expended by the shipowner during a charter. The United States argues that the shipowner is entitled to a net profit award only; the appellee's position is that it has in fact received only a net profit. The appellee argues that the shipowner's normal operating expenses of wages and provisions did not cease during the repair period because the full crew was maintained on board.

The general measure of the economic loss of a vessel during detention is net profit. The contract rate for rental of the vessel is a proper guide for measuring the lost income of the shipowner. Delta Marine Drilling Co. v. M/V Baroid Ranger, 5 Cir. 1972, 454 F.2d 128. From a gross charter price must be subtracted the ordinary expenses the shipowner would incur in earning that gross fee. The Steamboat Potomac v. Cannon; The Umbria, 1897, 166 U.S. 404, 421, 17 S.Ct. 610, 617, 41 L.Ed. 1053. The burden is upon the shipowner to prove the extent of damages actually sustained by him. The Steamboat Potomac, 105 U.S. at 630; Bue, Admiralty Law in the Fifth Circuit—II, 5 Houst.L.Rev. 772, 915–20 (1968). "If the vessel is under charter and is off-hire as a result of the collision, damage to the owner can be computed by calculating the lost charter hire and deducting any savings to the owner attributable to the ship's being out of service. In other words, the ordinary operating expenses can be deducted from the charter hire and out of pocket expenses during the layup added in when arriving at proper damages." *Bue*, at 917; Moore McCormack Lines v. The Esso Camden, 2 Cir. 1957, 244 F.2d 198; The Hygrade NO. 24 v. The Dynamic, 2 Cir. 1956, 233 F.2d 444.[5] Where the shipowner makes no savings of operating expenses during repairs the charter price is an adequate measure of damage. See Isthmian S.S. Co. v. Jarka Corp., 1951, D.Md., 100 F. Supp. 856; The Belgenland, 1888, S.D. N.Y., 36 F. 504. Here, there were no savings to the shipowner for the cost of fuel because the charterer would bear

5. Cf. 5 Corbin on Contracts § 1002, p. 35 (1964): "Just compensation requires that the plaintiff should be given judgment for the full value of what was promised to him, diminished only by the amount of saving in cost to him that the breach of the defendant has made reasonably possible."

the cost of fuel during the charter. Here also, though the shipowner bears the cost of wages, food, provisions, insurance, depreciation, and tax during a charter, none of those expenses were saved since the accident occurred in mid-charter and the crew was maintained throughout the ten day repair period. Thus, though the defendant would be entitled for a deduction for any savings by the shipowner, none have been shown on the record before us.

Reversed and remanded for further proceedings not inconsistent with this opinion.