**Kenneth McKINNEY, Sr., d/b/a McKinney & Sons Truck Lines, Plaintiff,**

v.

**GRACE DISTRIBUTION SERVICES, INC., Defendant.**

Civ. A. No. S85–0947(NG).

United States District Court,
S.D. Mississippi, S.D.

Nov. 26, 1986.

Karen J. Young, Cy Faneca, Biloxi, Miss., G. Steven Duplechain, Baton Rouge, La., for plaintiff.

James D. Johnson, Dorrance Aultman, Thomas D. McNeese, Tim W. Lindsay, Hattiesburg, Miss., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEX, District Judge.

Kenneth McKinney, Sr., an adult resident citizen of the State of Louisiana, filed this cause against Grace Distribution Services, Inc., a corporation organized and existing under the laws of a state other than Louisiana and doing business in Mississippi. The Plaintiff alleged that one Robert J. Landon, an employee of Grace Distribution Services, Inc., negligently backed a tractor/trailer rig owned by the Defendant into the tractor/trailer rig owned by the Plaintiff while it was parked at a weigh-station in Picayune, Mississippi, on or about July 14, 1983, causing injury to Plaintiff in the form of property damages, loss of income resulting from down-time, and other incidental expenses.

Defendant has conceded that their employee, Robert J. Landon, was in fact negligent in the operation of its tractor/trailer rig. Defendant has further conceded that Robert J. Landon was acting in the scope of his employment, and, therefore, the Defendant, through the doctrine of responde-at superior, is imputed with the negligence of its employees.

The remaining issues to be resolved by this Court are the nature and extent of compensable damages suffered by Plaintiff as a result of the accident.

## A. Factual Findings

1. Prior to the accident on July 14, 1983, McKinney's tractor/trailer was in good working condition and met Interstate Commerce Commission standards.

2. At the time of the accident, McKinney's tractor/trailer was committed to Chemical Leaman Tank Lines, Inc., ("Chemical Leaman") pursuant to a long-term lease agreement whereby Chemical Leaman, in exchange for the use of the McKinney vehicle and drivers to transport the company's products, contracted to pay McKinney & Sons Truck Lines a defined percentage of the gross revenue derived from the transport of each load.

3. Grace Distribution Services, Inc., was insured with CNA on July 14, 1983.

4. CNA assigned the investigation of the McKinney claim to Crawford & Company, an insurance claims adjusting firm.

5. On or about July 21, 1983, Jerry Jessup, an automobile damage appraiser in Crawford & Company's Lake Charles, Louisiana, office prepared an estimate of the damages to McKinney's 1972 Kenworth tractor/trailer which indicated repair costs of $1,351.69.

6. Approximately two (2) weeks after Jessup appraised the damaged McKinney vehicle, the tractor/trailer was taken to Whitlow Truck Center, Inc., ("Whitlow") a heavy truck repair center in Port Allen, Louisiana, by Kenneth McKinney, Sr.[1]

7. On or about August 8, 1983, Brenda Montaro of CNA transferred assignment of the McKinney claim to Crawford & Company's Baton Rouge, Louisiana, office.

8. Kenneth McKinney, Sr., was distressed over what he felt to be an inadequate evaluation of the damages to his vehicle as a result of the July 14, 1983, accident; Mr. McKinney constantly complained to the service manager at Whitlow, Lonnie "Butch" Cooksey, Jr., that his tractor/trailer was not being fully and completely repaired.

9. On or about September 1, 1983, Larry Lott, a heavy equipment appraiser from Crawford & Company's Baton Rouge office, went to Whitlow at the behest of Cooksey to inspect the damaged McKinney vehicle and follow up on the estimate prepared by Crawford & Company's Jerry Jessup in Lake Charles.

10. After inspecting the McKinney vehicle, Lott prepared a supplemental report for Montaro of CNA indicating additional items of damages to the McKinney tractor/trailer that were occasioned by the July 14, 1983, accident in the amount of $828.84.

11. Due to McKinney's continued insistence that the adjusters had overlooked certain accident related items of damages in their two previous estimates, Lott again went to Whitlow, on or about September 14, 1983, to further inspect the McKinney vehicle.

12. As a result of Lott's September 14, 1983, inspection of the McKinney vehicle, a second supplemental report was prepared for CNA indicating additional items of damages in the amount of $637.11 that were a part of the collision damages to the McKinney vehicle.

13. During the time period that the McKinney tractor/trailer was at Whitlow undergoing repairs of the damages caused by the July 14, 1983, accident, Kenneth McKinney, Sr., had non-accident related repairs performed on his vehicle in the amount of $342.55.

14. CNA has paid Whitlow $2,725.49 toward the repair costs for the McKinney vehicle.

15. On or about September 21, 1983, Kenneth McKinney, Sr., travelled to Baton Rouge, to pick up his repaired 1972 Kenworth tractor/trailer from Whitlow.[2]

16. On or about September 23, 1983, Kenneth McKinney, Sr., returned to Whitlow complaining that the accident related damages to his tractor/trailer had not been

---

**1.** McKinney's receipt for his return bus trip from Baton Rouge, Louisiana, to Lake Charles, Louisiana, on August 9, 1983, supports this finding.

**2.** McKinney's receipt for his trip from Lake Charles, Louisiana, to Baton Rouge, Louisiana, on September 23, 1983, supports this finding.

fully and/or properly repaired; the vehicle did not meet Interstate Commerce Commission standards and Chemical Leaman would not accept the vehicle as fit to transport company products.

17. On September 29, 1983, the McKinney vehicle was finally picked up from Whitlow; Kenneth McKinney, Sr., paid $293.60 in accident related repair expenses in order to obtain possession and business use of his tractor/trailer.

18. Shortly after the July 14, 1983, accident, efforts were made to secure a substitute tractor/trailer for McKinney's use while his vehicle underwent repairs. However, due to various Interstate Commerce Commission permit requirements and Chemical Leaman's policy regarding subleased trucks, McKinney could not have utilized the substitute vehicle in his business endeavors. Effectively, the option of a substitute vehicle was unavailable to McKinney.

19. As a direct result of the accident, Kenneth McKinney, Sr., lost profits that would have been derived from the use of his tractor/trailer to haul Chemical Leaman products from July 14, 1983, until September 29, 1983.

20. In the six-week period immediately preceding the accident McKinney's truck statements reflect that he generated a net income totaling $11,306.08.

21. Alton Boroughs, Terminal Manager of Chemical Leaman's Lake Charles, office compiled a loss of revenues evidencing McKinney's lost gross earnings in the amount of $11,390.66 for the six-week period immediately following the accident by keeping track of the revenue generated by the tractor/trailer that actually pulled the loads McKinney would have carried but for the accident.

22. McKinney's truck statements for the six-week period immediately preceding the accident indicate an expended $2,215.44 in fuel costs.

23. McKinney's income tax statements for 1981, 1982 and 1983 reflect his total annual operating expenses for these taxable years.

### B.  Legal Conclusions

In *National Dairy Products Corp. v. Jumper,* 241 Miss. 339, 130 So.2d 922 (1961), the Mississippi Supreme Court stated:

> When a commercial vehicle which has been injured may be repaired, if the repairs will substantially restore it to its former condition, the cost of such repairs will ordinarily furnish an element of damages .... If in addition ... the owner has lost the vehicle's use for a period of time, as during the process of repair, he is entitled to the value of the use of the property during this period. The weight of authority is that except in special circumstances, loss of profits cannot be considered as a measure of such damages .... Damages for loss of use should be measured by the cost of hiring another vehicle while the repairs are being made .... [However], [w]here no substitute vehicle can be rented in the market and area reasonably related to complainant's business and trade area, loss of profits may be recovered where the evidence is of sufficient probative value to adequately and clearly measure such loss of profits .... [A]n award for loss of profits is erroneous in the absence of a showing that no other vehicle could be rented .... The burden of proof to establish the exception is upon the person seeking damages.

*Id.,* 130 So.2d at 923.

Concerning repair costs, the Court finds that McKinney's recovery should be as follows:

| | |
|---|---|
| Total cost to restore vehicle to former condition | $ 3,111.24 |
| Dollars paid prior to litigation by defendant to Whitlow on behalf of McKinney | $ 2,725.49 |
| Defendant's outstanding liability for repairs | $ 385.75 |

As to McKinney's claim for lost profits, the Court finds that Plaintiff has unquestionably made his case for these special damages under the *Jumper* requirements. Chemical Leaman's policy prohibiting the use of subleased tractors made vehicular

substitution an impossible alternative for McKinney; the Plaintiff has shown that no other vehicle could be rented as mandated by *Jumper*. With respect to the *Jumper* requirement that proof of lost profits be adequately established by clear evidence, although there can be no doubt but that McKinney has shown a loss of profits, the Mississippi Supreme Court has, nonetheless, left this Court guideless in its efforts to determine lost profit damages. In the absence of a formulaic directive from that august body in this regard, the Court must make an informed Erie-bound prediction of the Mississippi Supreme Court's approach to handling these special damages. *See Lovelace v. Astra Trading Corp.*, 439 F.Supp. 753, 756 (S.D.Miss.1977).

Turning to the law of admiralty where lost profits arising from a maritime casualty have long been recognized as a recoverable element of damages, *The Conqueror*, 166 U.S. 110, 125, 17 S.Ct. 510, 515, 41 L.Ed. 937 (1897), the Court observes that the requirements for recovery of lost profits arising out of loss of use of a commercial vessel are remarkably similar to the requirements set out in *Jumper* in that the burden rests on the party seeking damages to show an entitlement to lost profits and to prove the amount of lost profits with reasonable certainty. *Compare, Skou v. United States*, 478 F.2d 343, 345 (5th Cir.

1973) *W. Jumper*, 241 Miss. at 342, 130 So.2d at 923 (in both cases, where commercial vehicle owner asserts lost profits claim, burden on plaintiff to show right to such damages and prove amount of such damages with certainty). The Court therefore concludes that the Mississippi Supreme Court would utilize a formula similar to that applied in the admiralty field to derive lost profits during the repair period The Fifth Circuit has written that the formula for determining lost profits during a repair period is "a simple calculation based upon the number of days the [vessel] was out of service ... multiplied by the average daily lost profits for the vessel." *Delta S.S. Lines, Inc., v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1002 (5th Cir.1984). From this gross figure must be subtracted the ordinary expenses the shipowner would incur in operating his vessel to ascertain the owner's net profit, the general measure of the economic loss of the vessel during repair time. *Skou*, 478 F.2d 347.

In the instant case, the Court notes that the McKinney vehicle was down for repairs for a period of eleven (11) weeks. Plaintiff established that for the six-week period immediately prior to the July 14, 1983, accident his income was as follows:

---

3. "Other Expenses" includes such items as permits, registration requirements, weigh-station fines, tolls and other miscellaneous expenses incurred in operating a heavy commercial truck.

4. This figure consists of the sum of check numbered 68825 issued to McKinney in the amount of $4,421.21 plus a $598.37 overdraft deduction from McKinney's net earnings for this pay period.

5. This figure consists of the sum of check numbered 68983 issued to McKinney in the amount of $1,872.93 plus an $899.87 overdraft deduction for McKinney's net earnings for this pay period.

| Pay Period | Gross Earnings | Fuel Costs | Other Expenses[3] | Net Earnings |
|---|---|---|---|---|
| 5/27/83 | $3,148.41 | $1,089.46 | $175.00 | $1,883.95 |
| 6/10/83 | 5,330.10 | 300.52 | 10.00 | 5,019.58[4] |
| 6/24/83 | 3,385.81 | 563.01 | 50.00 | 2,272.80[5] |
| 7/8/83 | 3,414.44 | 262.43 | 24.00 | 3,128.00 |
| TOTAL | 15,278.76 | 2,215.42 | 259.00 | 12,804.34 |
| WEEKLY AVERAGE: | 2,546.46 | 379.24 | 43.17 | 2,134.05 |

The Record further reflects that for the six-week period immediately following the July 14, 1983, accident, Chemical Leaman compiled the gross earnings of the tractor/trailer that hauled the loads McKinney would have carried had his tractor been available as follows:

July 14, 1983, through August 4, 1983 (three-week period):

| | |
|---|---|
| B/L 116255 | $ 638.07 |
| B/L 116256 | 1,819.27 |
| B/L 116203 | 1,394.22 |
| B/L 342679 | 965.16 |
| B/L 116302 | 940.31 |
| B/L 474548 | 564.28 |
| GROSS TOTAL: | $ 6,321.31 |

August 5, 1983, through August 25, 1983 (three-week period):

| | |
|---|---|
| B/L No. 116312 | $ 1,216.00 |
| B/L No. 604280 | 442.85 |
| B/L No. 414852 | 640.00 |
| B/L No. 670662 | 459.92 |
| B/L No. 550681 | 1,209.60 |
| B/L No. 657848 | 381.58 |
| B/L 670180 | 362.62 |

**6.** Due to the drastic fluctuations in oil prices during 1981–1983, the Court finds that the average fuel expenses shown only six weeks prior to this accident are more reliable than an average derived from McKinney's income tax statements.

**7.** The Court calculated the weekly food and lodging average as follows:

| | |
|---|---|
| Food/Lodging 1983 tax return | $6,387.00 |
| Food/Lodging 1982 tax return | 5,367.00 |
| Food/Lodging 1981 tax return | 5,560.00 |
| TOTAL: | $17,314.00 |

| | |
|---|---|
| B/L No. 670196 | $ 311.78 |
| GROSS TOTAL: | $ 5,024.35 |

Considering that over the documented twelve-week period Chemical Leaman's records reflect that McKinney could have grossed $26,624.42, the Court determines that McKinney's average weekly gross at the time of the accident was $2,218.70. Taking $369.24 as McKinney's average weekly fuel cost[6] and $43.17 as his weekly miscellaneous expenses at the time of the accident and average weekly figures of $127.06 for his food and lodging and $145.66 for general maintenance based on McKinney's income tax statements,[7] the Court finds that McKinney's lost profits damages are as follows:

| | |
|---|---|
| Weekly Gross | $ 2,218.70 |
| Weekly Fuel Cost | − 369.24 |
| | 1,849.46 |
| Weekly Food/Lodging | − 120.23 |
| | 1,729.23 |
| Weekly General Maintenance | − 145.66 |
| | 1,583.57 |
| Weekly Miscellaneous | £ 43.17 |
| WEEKLY NET: | 1,540.40 |

This total divided by thirty-six months ($480.94), then again by four weeks yields an average weekly food and lodging expense in the amount of $120.23.

The Court calculated the weekly general maintenance average as follows:

| | |
|---|---|
| Repairs 1983 tax return | $6,588.00 |
| Repairs 1982 tax return | 6,690.00 |
| Repairs 1981 tax return | 7,697.00 |
| TOTAL: | $20,975.00 |

This total divided by thirty-six months ($582.64), then again by four weeks yields an

Number of weeks vehicle down for
repairs                        ×      11
TOTAL LOST PROFITS:            $16,944.40

McKinney is entitled to repair costs in the amount of $385.75 and lost profits in the amount of $16,946.71 for a total recovery amounting to $17,332.46.

A separate judgment in conformity with the foregoing Findings of Fact and Conclusions of Law shall be presented to the Court within ten (10) days of the date hereof by the prevailing party.

average weekly maintenance expense in the    amount of $145.66.