828 F.2d 1114
 Nellie Kathryn JOHNSON, etc., et al., Plaintiffs,
v.
OTTO CANDIES, INC., Defendant-Third-Party
Plaintiff-Appellant, Cross-Appellee,
v.
ATWOOD OCEANICS, INC., Third-Party Defendant-Appellee,
Cross-Appellant.
ATWOOD OCEANICS, INC., Plaintiff-Appellee, Cross-Appellant,
v.
M/V LUDWIG CANDIES, et al., Defendants,
Otto Candies, Inc., Defendant-Appellant, Cross-Appellee.
 No. 86-3254.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 8, 1987.
 
 Allen F. Campbell, Cornelius G. Van Dalen, Deutsch, Kerrigan & Stiles, New Orleans, La., for Otto Candies.
 James G. Burke, Jr., Burke & Mayer, New Orleans, La., for Atwood Oceanics.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before GARWOOD, JOLLY, and HILL, Circuit Judges.
 GARWOOD, Circuit Judge:
 
 
 1
 This case arises from vessel damage incurred in rough seas and high winds during a storm in the Gulf of Mexico. Pursuant to a drilling contract with Atwood Oceanics, Inc. (Atwood), Exxon Corporation (Exxon) hired Otto Candies, Inc. (Candies) to tow Atwood's drilling rig D/B VICKSBURG from Galveston, Texas to a drilling site off the coast of Mobile, Alabama. During a storm en route, the VICKSBURG was damaged, and a Candies tug was lost. Candies appeals, challenging the amount of damages awarded to Atwood, claiming that the district court erred in including certain items in its calculation. Atwood cross-appeals, challenging the district court's exclusion of other items from the award.
 
 Facts and Proceedings Below
 
 2
 On February 25, 1984, Candies dispatched three of its vessels, the M/V LUDWIG CANDIES, the M/V NICK CANDIES, and the M/V KEVIN CANDIES, to tow the VICKSBURG from Galveston, Texas to an offshore drilling site near Mobile. The VICKSBURG, a jack-up drilling rig, was owned by Atwood and was chartered by Exxon for use in its drilling operations. Exxon's agreement with Atwood required Exxon to provide tugs for any move of the VICKSBURG. Exxon had therefore engaged the Candies tugs for this move. En route, on February 27, 1984, the vessels encountered extremely rough weather in the Gulf of Mexico.
 
 
 3
 The tow line of the NICK CANDIES parted in the storm and as the tug's crew members reattached it, the NICK CANDIES collided with the VICKSBURG. The collision damaged the VICKSBURG. Shortly thereafter, the tow lines of both the NICK CANDIES and the KEVIN CANDIES parted, leaving only the LUDWIG CANDIES to tow the VICKSBURG. As the winds increased and the waves became higher, the LUDWIG CANDIES capsized and sank, injuring L.N. Johnson, one of its crew members, and necessitating the hiring of additional tugs to guide the VICKSBURG to shore in Mobile.
 
 
 4
 L.N. Johnson and his wife, Nellie Johnson, initially filed suit against Candies in May 1984 for personal injuries sustained by L.N. Johnson when the LUDWIG CANDIES capsized. The Johnsons sought to recover under the Jones Act and under general maritime law. Candies impleaded Atwood, as owner and operator of the VICKSBURG, alleging that Atwood was responsible for Johnson's injuries and for the loss of the LUDWIG CANDIES. Atwood then filed a cross-claim demanding indemnity and contribution from Candies. Subsequently, Atwood also filed a separate action against Candies seeking recovery for damages to the VICKSBURG that, according to Atwood, resulted from the negligence of Candies during the storm. The district court ordered this action consolidated with the previously filed one.
 
 
 5
 The parties settled the personal injury claims of the Johnsons and the case proceeded to trial on the remaining property damage claims. Trial to the court commenced on June 10, 1985. During trial, Atwood and Candies reached a settlement agreement on the issue of liability. Under the terms of the settlement, which was read in open court and approved by the district court, Atwood agreed to pay Candies fifteen percent of provable damages sustained as a result of the loss of the LUDWIG CANDIES. Candies agreed to pay eighty percent of damages provable by Atwood for physical damage to the VICKSBURG, its down time, and other damages resulting from "the incident on February 25th through March 2nd." The trial was then aborted.
 
 
 6
 Thereafter, on November 21, 1985, a bench trial was held solely to determine the quantum of damages owed by Candies and Atwood pursuant to their settlement agreement. The district court issued a memorandum opinion itemizing the elements of damages proved by each of the parties. On the basis of this itemization, the court concluded that Candies was entitled to recover from Atwood fifteen percent of $2,000,000, or $300,000, and that Atwood was entitled to recover from Candies eighty percent of $410,090.47, or $328,972.38. After netting out these figures, the district court entered judgment in favor of Atwood in the amount of $28,072.38, plus legal interest from February 27, 1984. This appeal followed.
 
 Discussion
 
 7
 On appeal the parties raise a number of challenges to the district court's findings as to various items of damages. Except for the two issues discussed below, none of these matters have sufficient merit to warrant discussion. With regard to the challenges that we elect not to expressly address in this opinion, it suffices to note that we have considered each of these claims in light of the record evidence and have determined that the district court's findings in respect thereto are not clearly erroneous, and such findings are accordingly in all respects affirmed.
 
 
 8
 I. Candies Appeal--The "Brown Repairs"
 
 
 9
 Candies contends that the district court erred in allowing Atwood to recover for certain repairs to the VICKSBURG made by Brown Services, Inc. (Brown) after the VICKSBURG finally reached its offshore drilling site on March 5, 1984. The challenged items of damages include Atwood in-house labor costs, a repair survey by the American Bureau of Shipping (ABI), and invoices from Brown for repair work performed in late March and early April 1984 (collectively, the Brown repairs). According to Candies, the district court should have disallowed recovery of these items because there was insufficient evidence that they were necessitated by the Candies towing incident of February 25-March 2, 1984.
 
 
 10
 The Brown repairs involved work on both the port and starboard sides of the VICKSBURG. Candies asserts that the evidence showed the portside damage either pre-existed the events in question or occurred at some later date. Candies further contends that the Brown repairs to the starboard side of the VICKSBURG related to conditions of the rig's hull that pre-existed the Candies towing. Therefore, according to Candies, none of the Brown repair items were properly chargeable to it.
 
 
 11
 The evidence concerning which of the many dents and buckles in the VICKSBURG resulted from the Candies towing incident during the storm is not entirely consistent. The water is made murkier by the failure of the parties to support their arguments with specific references to the record. Nonetheless, our review of the record in its entirety convinces us that the district court's findings in this regard were not clearly erroneous. See Fed.R.Civ.P. 52(a); Ayers v. United States, 750 F.2d 449, 452 (5th Cir.1985).
 
 
 12
 Before the VICKSBURG left Galveston on February 25, 1984, the rig underwent a thorough inspection. Bill Howard, Atwood's senior project manager, testified that he supervised this inspection. He said Exxon, the Coast Guard, and the ABI, as well as Atwood personnel, participated in the inspection. When the VICKSBURG reached Mobile following the storm and the failed Candies towing effort, the VICKSBURG received another thorough inspection, at which Howard was again present. The inspection in Mobile was performed as soon as the rig arrived for repairs at Bender Shipbuilding & Repair Company (Bender), on March 3, 1984. Representatives from the Coast Guard, ABI, and both Atwood and Candies inspected the vessel, along with independent marine surveyors hired by the parties and their underwriters. Following extensive repair work by Bender, the VICKSBURG moved to its drilling location off the coast from Mobile. Once on location, further repair work was done to the VICKSBURG. This work comprises the disputed Brown repairs.
 
 
 13
 The reports from the various inspections and the testimony of witnesses who participated consistently indicate that the work done by Brown to the starboard side of the VICKSBURG repaired areas of the rig that had been damaged before it ever left Galveston. The evidence also makes plain, however, that Atwood deducted from its claimed damages the amount it was charged by Brown for this portion of the Brown repairs. Howard testified that he had the responsibility of determining which of the invoices paid by Atwood reflected costs attributable to the Candies towing incident. According to Howard, Brown's original invoice to Atwood totaled approximately $27,000. Since that invoice reflected labor costs for Brown's repairs to both the port and starboard sides of the VICKSBURG, as well as the cost of the steel used for the portside repairs, Howard said he deducted from the total the amount he estimated corresponded to the starboard repairs.[1] The difference, $22,661.63, equals the amount claimed by Atwood, and awarded by the district court, for repair work done by Brown. Consequently, we find no merit in Candies' argument that this item of damages erroneously includes costs of repairs to the starboard side of the VICKSBURG.
 
 
 14
 The evidence regarding Brown repairs to the portside of the VICKSBURG is more equivocal, but still provides adequate support for the district court's finding. A report and diagram prepared by employees of Marathon Le Tourneau Company (Le Tourneau), who inspected the VICKSBURG and surveyed her damage in Mobile at Atwood's request, indicated two different areas of damage to the portside of the rig. One area the report attributed to the Candies towing incident and the other, the report stated, "look[ed] to be old." A "Field Survey Report" prepared by an independent marine surveyor, who also surveyed the VICKSBURG's damages in Mobile and who was hired by Atwood's underwriters, listed twelve separate items of structural damage to the portside of the rig. Some of these the Field Survey Report described as being rusty, suggesting that they pre-dated the trip from Galveston the previous week; others were not described as having rust.
 
 
 15
 Candies contends that all of the hull damage indicated by these reports to be fresh was fully repaired by Bender in Mobile, and that the Brown portside repairs were either of pre-existing damage, or subsequent damage, or both. In that they confirm the presence of old, rusty dents in the same general area as the storm-related damage, the Le Tourneau and Field Survey reports support Candies' position. Further support is provided by the testimony of Candies' representative at the Mobile inspection, John Kingston. Kingston testified that in his opinion all of the items on the Field Survey Report except those approved for repair by Bender reflected unrelated, old damage to the VICKSBURG.
 
 
 16
 On the whole, however, we think the bulk of the evidence runs counter to Candies' contention. Several witnesses testified that only some of the damage approved as a result of the Field Survey Report for repair by Bender was actually repaired in Mobile. According to these witnesses, the major item repaired by Bender was a fracture located at the deck level of the VICKSBURG. Although the NICK CANDIES also caused a number of other, smaller dents in the VICKSBURG, repair of these was postponed until the rig was on location. These dents were lower, at or beneath the water level, so that Bender could not repair them without drydocking the VICKSBURG. Since Atwood wanted to avoid breaching a very favorable drilling contract with Exxon, and since the ABI okayed deferral of the additional necessary repairs, Atwood elected not to have Bender do them. Atwood maintains that these comprise the portside repairs made by Brown.
 
 
 17
 This explanation makes sense. It is consistent with the Field Survey Report, which states that the NICK CANDIES hit the VICKSBURG a number of times in the same general area and which lists several "fresh" dented or buckled areas on the portside of the VICKSBURG. Testimony by Howard, who was in charge of managing the repair project for Atwood, is also consistent with this explanation. Howard confirmed that the Brown repairs to the portside of the VICKSBURG were to an area of the rig's hull that was at and below the water line when the vessel was afloat, and that the repairs were not of damaged areas indicated as old in the Field Survey Report and the Le Tourneau report. Considering all the evidence, therefore, we cannot say that the district court clearly erred in including the Brown repairs as items of damages owed to Atwood by Candies. Accordingly, we affirm this finding by the district court.
 
 II. Atwood Appeal--Excessive Downtime
 
 18
 In the schedule of damages that Atwood submitted to the district court, Atwood claimed entitlement to $104,192.04 in damages for "loss of use." According to Atwood, the district court erred in disallowing a portion of this figure. This $104,192.04 item represents the part of Atwood's invoice to Exxon for moving the VICKSBURG that Exxon refused to pay. John Irwin, Atwood's vice president, explained that Atwood had billed Exxon at the stipulated moving rate for the actual time it took the rig to travel from Galveston to Mobile. Irwin said Exxon refused to pay this total, and instead agreed to pay what Exxon considered to be a "reasonable" moving time of six days, or 182 hours. Exxon therefore paid Atwood for 182 hours of the 262 hours charged, leaving eighty hours during which the VICKSBURG was either in transit or at Bender's, but for which Atwood was not reimbursed.
 
 
 19
 Atwood's claimed "loss of use" damages of $104,192.04 correspond to these eighty hours for which Exxon refused to pay. The district court found that the eighty hours reflected the amount of time the VICKSBURG was delayed in reaching its destination due to its detour to Bender's in Mobile for repairs, and that but for the fault of Candies, the detour would not have been necessary. The court also found, however, that even if the Candies towing incident had not occurred, before drilling could have commenced, the VICKSBURG's spud cans would have had to be inspected. As it was, Atwood was able to hire divers to inspect the rig's spud cans during the time the Candies-related repairs were performed at Bender's. The spud can inspection took twenty-six hours. Based on its conclusion that the twenty-six-hour spud can inspection would have delayed drilling by that amount of time whether or not the Candies incident had taken place, the district court reduced Atwood's recoverable damages for the VICKSBURG's downtime by 26/80ths, from $104,192.04 to $70,329.63.
 
 
 20
 Atwood challenges the district court's reduction as inconsistent with Fifth Circuit case law. In support of its position, Atwood cites Delta Marine Drilling Co. v. M/V BAROID RANGER, 454 F.2d 128 (5th Cir.1972). In Delta Marine, we affirmed the district court's refusal to reduce the loss of use award in a collision case for the time spent on other repairs which were performed simultaneously with the collision-related repairs and did not extend the time lost on account of the performance of the collision-related repairs. Id. at 131. However, there was no indication in Delta Marine that the noncollision repairs were required in order for the vessel to do the tasks for which it was hired. Instead, the implication was that these repairs were merely incidental. This distinguishes Delta Marine from the case at hand.
 
 
 21
 That our decision in Delta Marine, properly construed, does not extend to cover the present circumstances is made clear by the authority we relied upon there. See Clyde S.S. Co. v. City of New York, 20 F.2d 381 (2d Cir.1927), cited in Delta Marine, 454 F.2d at 131 n. 10. In Clyde, where Judge Learned Hand authored the opinion, the Second Circuit affirmed the district court's disallowance of a shipowner's damage claim for the ten days his vessel was undergoing simultaneously performed collision-related and other repairs. The Clyde Court reasoned that since the repairs unrelated to the tort-feasor's actions had to be done that season, the owner would have lost the use of the vessel for that period of time regardless of the collision; therefore, he was not entitled to recover damages for the detention. In Judge Hand's words:"[I]f the ship would in any event go out of commission, collision or no collision, and if therefore, during the period when the collision repairs are actually made, she would have earned no profits for her owner, he cannot be said to have been damaged. The collision has not deprived him of earnings which he would have made at that season." 20 F.2d at 381.
 
 
 22
 The situation in Clyde is analogous to that here. The district court found, and the parties concede, that the spud can inspection on the VICKSBURG was necessary before the rig could begin drilling operations regardless of the Candies towing incident. Like the work done in Clyde, which was necessary for the ship's certificate but unrelated to the collision, the spud can inspection was not an "incidental repair" that could have been done at any time (including times when such work would not impair the earning capacity the vessel would otherwise have). Rather, the spud can inspection was a necessary prerequisite for the VICKSBURG to be able to do the very work Exxon hired it to do.
 
 
 23
 This result also squares with the principle underlying damage awards for loss of use. The injured party may recover damages for lost income resulting from a collision, but only to the extent that those damages can be proven with reasonable certainty. Bolivar County Gravel Co. v. Thomas Marine Co., 585 F.2d 1306, 1308 n. 2 (5th Cir.1978). Here, the district court found that the VICKSBURG would have been out of service for the period of time required to complete the spud inspection. Thus, Atwood has suffered no loss from the detention of its vessel for that period. See Inland Oil and Transport Co. v. Ark-White Towing Co., 696 F.2d 321, 326-27 (5th Cir.1983) (no damages recoverable for loss of use of barge unless the vessel would have been used during time spent in repair). The fact that Atwood was able to perform the spud inspection while the VICKSBURG was laid up for repairs does not alter this conclusion. Only actual damages are recoverable and Atwood suffered no damages for the period when but for the accident and subsequent repair the VICKSBURG would have been out of service. See Demetrius Maritime Co. v. S/T "Connecticut," 463 F.Supp. 1108, 1111 (S.D.N.Y.1979) ("If collision repairs are to be made while a ship would in any event be out of commission, earnings that would be lost during the time of repair ... cannot be regarded as consequences of the collision.").
 
 
 24
 On appeal Atwood seeks to avoid this conclusion by asserting for the first time that but for the Candies incident, it would not have sustained any loss of use time for the spud can inspection. Atwood bases this contention on its claim that under its contract with Exxon, it would have been paid for the time during which the cans were inspected. Candies counters, persuasively, that the evidence in the record fails to establish this fact.[2] As Candies notes, Atwood's agreement with Exxon was not introduced into evidence. Irwin, Atwood's representative, did testify that Atwood billed Exxon for the entire actual moving time from Galveston to the drilling site, but that does not show Atwood was contractually entitled to receive payment for the downtime necessary for the spud can inspection. Irwin also said Exxon calculated a reasonable moving time of 182 hours; however, he could not explain how Exxon arrived at that figure. There was no evidence as to whether or not this 182 hours included any time for spud can inspection. Neither the testimony nor the documents introduced into evidence adequately established that Atwood's contract with Exxon required Exxon to pay for the twenty-six-hour period during which the VICKSBURG's spud cans were inspected. We therefore conclude, largely on the basis of Delta Marine and Clyde, that the district court properly reduced Atwood's damage claim for loss of use to exclude the twenty-six hours during which the spud can inspection took place.
 
 Conclusion
 
 25
 Having carefully reviewed the entire record in light of the arguments presented on appeal, we conclude that the district court applied the proper legal standards in resolving the parties' damage claims. Since we further conclude that none of its factual findings are clearly erroneous, we affirm the district court's judgment in all respects.
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 To obtain this estimate, Howard said he multiplied the "number of men and the number of hours that they had spent working ... on the starboard side," by the "hourly rate [Atwood was] being charged." He did not deduct from Brown's invoice any amount to reflect the cost of the steel used on the starboard side because Brown used steel owned by Atwood, which Atwood already had in stock, and hence did not invoice Atwood for it
 
 
 [2]
 We conclude that in this particular the burden of proof was on Atwood, especially since it relates to a matter which should be particularly within Atwood's knowledge, rather than Candies'. Candies discharged its burden of showing that the spud can inspection was performed, the time involved, and that such inspection was a necessary precondition to the vessel's commencing the Exxon work. The burden then devolved on Atwood, as plaintiff in respect to this asserted damage item, to establish that it was entitled to compensation from Exxon (and was not paid by it) for spud can inspection time