United States Court of Appeals,
Fifth Circuit.

No. 92-9526

Summary Calendar.

In Re In the Matter of M/V NICOLE TRAHAN, Gulfgate Marine Transportation Company, Inc., as Owner of M/V Nicole Trahan for Exoneration From or Limitation of Liability.

GULFGATE MARINE TRANSPORTATION COMPANY, INC., as Owner of M/V NICOLE TRAHAN and Gulfgate Shipyard, Inc., Appellants-Cross-Appellees,

v.

A/S DAMPSKIBSSELSKABET SVENDBORG, et al., Claimants-Appellees-Cross-Appellants.

Jan. 12, 1994.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before JOLLY, WIENER, and EMILIO M. GARZA, Circuit Judges.

WIENER, Circuit Judge:

Plaintiffs in Limitation-Appellants/Cross-Appellees Gulfgate Marine Transportation Co. and Gulfgate Shipyard, Inc. (collectively, Gulfgate) appeal the district court's award of $144,909.86 in detention damages to Claimants-Appellees/Cross-Appellants A/S Dampskibsselskabet Svendborg and A.P. Moller[1] (collectively, Svendborg), asserting that Svendborg has not shown that repair-related delays after a casualty suffered by the M/V SVENDBORG MAERSK (the vessel) caused Svendborg to lose profits. Svendborg cross-appeals the district court's finding that $5,090 in travel expenses incurred by Svendborg's naval architect to conduct a *second* inspection of the vessel were not necessary expenses. Svendborg also cross-appeals the district court's award of prejudgment interest at the legal rate established under federal law (28 U.S.C. § 1961), rather than the rate specified by state law (La.Civil Code art. 2924). Finding no reversible error, we affirm.

I

FACTS AND PROCEEDINGS

---

[1]A/S Dampskibsselskabet Svendborg is the owner of the M/V SVENDBORG MAERSK; A.P. Moller is the operator of that vessel.

The vessel is a liquefied petroleum gas tanker operating in the "spot market" on a catch-as-catch-can basis. During 1989, the Danish-flagged vessel was never idle and was continuously engaged in trade in a strong, ready market for its services[2] under voyage charters—as opposed to time charters—to carry cargo from Europe to the United States and to the Far East and back again.[3] Svendborg usually negotiates the vessel's next charter and its commencement date during the course of the then-current charter. Every voyage charter for the vessel contained a commencement period of several days to allow for the vessel's arrival at port and commencement of loading operations (laydays). The collision charter laydays were March 4-18 (the vessel was loaded on March 11) and the subsequent charter had laydays of May 3-12 (the vessel arrived on May 2, and was allowed to berth on May 3—the briefs on appeal do not indicate when the vessel was loaded).

On March 12, 1989, while fogbound on the Mississippi River and anchored along the shore, the vessel was struck by Gulfgate's flotilla,[4] which caused a horizontal gash in the hull of the vessel above the waterline and also caused internal damage in her engine room adjacent to the gash. At the time, the vessel was operating under a front-haul charter (the collision charter). Cognizant officials (a U.S. Coast Guard inspector; the staff surveyor from the vessel's Classification Society, Lloyd's Register of Shipping; and an independent surveyor from Technical Maritime Associates, Inc.) told Svendborg that it could effect temporary repairs and continue on its way, on condition that Svendborg permanently repair the vessel at the vessel's next regular dry docking (which was expected

---

[2]These facts are based on express findings by the district court, which, except for the finding that the vessel was continuously employed, Gulfgate does not contest on appeal.

[3]Under a voyage charter, a tanker is paid by the voyage rather than for its time, i.e., paid a sum certain in consideration for carrying a metric ton of freight to its destination port. Such a charter requires the shipowner to defray all operating expenses of the journey. *Atlantic Richfield Co. v. Good Hope Refineries, Inc.,* 604 F.2d 865, 871 (5th Cir.1979). Costs of travel between charters, or "deadheading," are automatically (and properly) deducted from gross profits, as that travel time is considered part of the voyage. *See Nathaniel Shipping, Inc. v. General Electric Co.,* 920 F.2d 1256, 1267-68 (5th Cir.1991). A back-haul charter carries cargo *to* the U.S. and earns substantially less per metric ton of freight than a front-haul charter, which carries cargo *from* the U.S. to foreign ports.

[4]Gulfgate's Tugs, MICHEL TRAHAN and NICOLE TRAHAN, had pushed their tow of three barges into the bank because of the fog. One barge broke loose, and one or both of the barges remaining in the flotilla drifted away from the bank and collided with the vessel.

to occur in May 1990), but no later than September 1990.

Two naval architects inspected the collision damage and approved arrangements for necessary repairs. One inspector was a naval architect who resided in New Orleans; the other inspector was Svendborg's own naval architect who was flown in from Europe, incurring $5,090 in travel and inspection expenses (travel expenses). The vessel received temporary repairs in New Orleans, then proceeded to Houston to pick up other cargo.

In Houston, the vessel was again inspected, this time by a U.S. Coast Guard inspector and a Lloyd's staff surveyor, as a result of which the condition for permanent repair was changed. Under the new condition, the vessel had to be repaired before its return to the U.S., by next dry docking *and* by May 1989. Knowing that it had to repair the vessel before returning to the U.S. ona back-haul charter, Svendborg decided to repair the vessel after unloading in the Far East.[5] Only subsequently did the vessel negotiate the back-haul charter, choosing a commencement date of May 3, which would allow the time between charters necessary to effect permanent repairs.

During the collision charter, Svendborg secured its next charter, a back-haul charter, and—to illustrate the market in which the vessel was operating—even secured the following front-haul charter. The vessel was able to complete the collision charter by its termination date and earned its full freight. All necessary permanent repairs to the vessel were carried out between the termination of the collision charter on April 24, 1989 and the commencement of the subsequent charter on May 3, 1989. The vessel was delayed 6.6 days for both temporary and permanent repairs,[6] but Svendborg neither bypassed nor turned down any charter because of those repairs.

The district court awarded costs of temporary and permanent repairs, detention damages, pre-judgment interest at the legal rate established pursuant to state law[7]; and post-judgment interest

---

[5]With this plan, Svendborg was able to carry out some repairs en route and minimize down-time.

[6]Of the 6.6 days for repairs, the vessel was delayed almost two days during the collision charter for temporary repair.

[7]LA.CIV.CODE art. 2924.

at the lower legal rate established under federal law.[8] The district court also awarded the travel expenses of both naval architects, including $5,090 in travel expenses incurred by Svendborg's architect.

Gulfgate moved for a new trial, which the district court granted in part and denied in part. Gulfgate first argued that the district court's award of detention damages was erroneous, contending that Svendborg should not be compensated for 6.6 days of delay that did not translate into any concrete loss of income. The district court rejected this argument and reaffirmed its award of detention damages.

Gulfgate also argued that the court erred in awarding $5,090 to compensate Svendborg for the travel expenses incurred by Svendborg's naval architect. As Svendborg had hired a local naval architect to inspect the vessel, Gulfgate reasoned, the travel expenses for Svendborg's own architect to conduct a second inspection were unnecessary. The district court agreed with Gulfgate, amending and reducing its judgment accordingly.

Gulfgate further argued that the court erred in selecting the Louisiana rate of pre-judgment interest,[9] asking instead that the court apply the lower federal rate.[10] Relying on *Pillsbury Co. v. Midland Enterprises, Inc.,*[11] the district court again agreed with Gulfgate, and amended the judgment to reflect the lower rate of prejudgment interest.

Not surprisingly, Gulfgate appeals the district court's award of detention damages, arguing that detention damages should not have been awarded in this case without specific proof of lost profits. Svendborg cross-appeals the district court's eradication of $5,090 in travel expenses from the judgment, and the court's award of prejudgment interest at the federal rather than the state rate.

II

---

[8] 28 U.S.C. § 1961.

[9] LA.CIV.CODE art. 2924.

[10] 28 U.S.C. § 1961.

[11] 715 F.Supp. 738 (E.D.La.1989), *aff'd,* 904 F.2d 317 (5th Cir.), *cert. denied,* 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990).

ANALYSIS

A. Detention Damages

Findings supporting a determination that an injured party is entitled to detention damages are findings of fact and are thus reviewable for clear error.[12]

Gulfgate argues that to be entitled to detention damages, Svendborg must prove lost profits specifically. Svendborg argues that it would have set the commencement date for the back-haul (post-collision) charter earlier than May 3 if it had not been forced to effect permanent repairs to the vessel. Gulfgate argues that the shippers on the back-haul voyage did not need or want the vessel until May 3: when the vessel arrived at Oita, Japan on May 2, it had to wait until May 3 to berth. Moreover, argues Gulfgate, Svendborg introduced no evidence that it bypassed or turned down any charter beginning earlier than May 3—because none existed.

This is the heart of the appeal: the argument is that the vessel, operating solely on a voyage charter basis, "tramping" from one job to the next, and being managed by owners who remained active in the market, cannot claim a loss of revenue unless it is proved that the vessel missed an available voyage; and no proof of any such lost opportunity was presented at trial. As the vessel had "lag time," claims Gulfgate, from April 24, 1989 to May 3, 1989, for which it could not earn profit (even though the days were charged to the subsequent charter), Gulfgate urges that there has been no "lost opportunity." Gulfgate basically asks this court to make vessels operating under voyage charters, as distinguished from time charters, prove lost profits by showing a specific lost opportunity—a type of showing which, under *Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.,*[13] this circuit has not heretofore required.

*Avondale Shipyards* states:

Loss of profit arising from a maritime casualty may be awarded as long as it is proved with reasonable certainty. *The CONQUEROR,* 166 U.S. at 125, 17 S.Ct. at 516, 41 L.Ed. at 944. This usually involves a showing in commercial cases that a vessel "has been engaged, or was capable of being engaged in a profitable commerce...." *Id.,* 166 U.S. at 133, 17 S.Ct. at 519. *See also Skou v. United States,* 478 F.2d 343, 344 (5th Cir.1973): "[M]ost clear, however,

---

[12]*Mitsui O.S.K. Lines, K.K. v. Horton & Horton, Inc.,* 480 F.2d 1104, 1106 (5th Cir.1973).

[13]747 F.2d 995, 1001 (5th Cir.1984).

is the proof that MADS SKOU was in immediate demand, as were her sister ships, upon her return to service. This demonstrates "that profits may be reasonably supposed to have been lost because the vessel was active in a ready market.' "[14]

Something more than the simple fact that the vessel was laid up for repairs must be shown[15]—a market for the vessel must be shown.[16] Testimony that the voyages before and after the casualty to the vessel were profitable, and that cargo was carried in between, is sufficient under *Avondale Shipyards.*[17] The rationale for not requiring specific proof of lost profits is as follows:

> To require the vessel owner to prove that specific cargos were not carried because of the casualty would be unsound for several reasons. First, it would impose an onerous burden not called for in this type of case. Second, it would be a rejection of the time honored rule in maritime cases that a proper method of determining lost detention profits is to seek a fair average based on a number of voyages before and after (citing N.D.Cal.1943 case).[18]

Under *Avondale Shipyards,* the issue is whether profits may be reasonably supposed to have been lost—i.e., whether in fact the second charter commencement date could have been negotiated earlier had permanent repairs not been required. The answer is, in a word, yes. Even though the vessel had earned all of its freight on the front-haul collision charter and the subsequent back-haul charter, the vessel lost valuable time in a market ready for its services. (And time *is* money in such a market.) The court found that the vessel's sailing toward the loading port on a new charter was part of the voyage and part of the vessel's employment and thus was not "lag time" when a vessel is "idle in port or puttering around aimlessly in search of work."[19] This is confirmed by the maritime practice of deducting the expenses of a vessel under a voyage charter, incurred while sailing in ballast from

[14]747 F.2d at 1001.

[15]*Mitsui O.S.K. Lines,* 480 F.2d at 1106 (quoting *The CONQUEROR,* 166 U.S. 110, 127, 17 S.Ct. 510, 517, 41 L.Ed. 937, 945 (1897)). Gulfgate states this rule as dispositive of this case, but does not inform this court that the "something more" required here is proof of a market for the vessel's services, not specific proof of lost profits or a lost charter, as Gulfgate would apparently have this court believe.

[16]*Skou v. United States,* 478 F.2d 343, 345 (5th Cir.1973).

[17]*Id.*

[18]*Id.*

[19]Gulfgate does not even half-heartedly contest these findings as clearly erroneous, but rather simply argues that the time period between charters was lag time as Svendborg was not earning revenue during that period.

its last delivery port in one voyage to the first loading port in the next, from the vessel's gross profit.

The proof required by *Avondale Shipyards* has been made:  profits may be reasonably supposed to have been lost by Svendborg because the vessel was active in a market ready for its services.  The question is whether we will require more, and find that *Avondale Shipyards* does not apply:  is this the type of case in which requiring a vessel owner to prove lost profits specifically would *not* be an onerous burden?

Although *Avondale Shipyards* may easily be distinguished on its facts, the factual differences between that case and this one do not mandate our application of a rule, contrary to *Avondale Shipyards,* that would require specific proof of lost profits or a lost opportunity.  In *Avondale Shipyards,* it was considered onerous for a vessel out of commission for almost six months to prove its lost profits.  Although the vessel in the instant case was only "detained" 6.6 days, it is no less difficult to prove lost profits or a lost charter.  The verity of this statement is demonstrated by the dearth of evidence in the record before us that the vessel lost an opportunity, or that the commencement date could have been set earlier had Svendborg not had to make permanent repairs to the vessel.  After learning that the vessel had to be permanently repaired by May 1989, Svendborg negotiated for a commencement date on the next charter that would allow time for such repair to be completed.[20]  Svendborg put the vessel off charter for 10 days knowing that the 10-day period would have to suffice for travel and repair.  We thus apply the rule in *Avondale Shipyards* that lost profits do not have to be proven specifically:  we do not penalize Svendborg for not going through the useless process of setting a load date, not meeting it, and then attempting to show detention damages by that route.

Gulfgate also argues that Svendborg mitigated its damages by seeking permanent repair after the termination of the collision charter, and thus cannot "contradict itself" by seeking compensation for lost profits it never suffered.  Svendborg did mitigate its damages, and does not seek damages for freights it did not lose.  As the district court specifically found, if Svendborg had permanently repaired the vessel in New Orleans during the collision charter, the profits of the collision voyage would have

---

[20]*See Skou v. United States,* 478 F.2d 343, 346 (5th Cir.1973).

been jeopardized. Permanent repair during the collision voyage would have required the vessel to forego delivery to a third optional port of discharge in the Far East, and thus cost Svendborg $45,000 in additional gross freights.

Gulfgate misses the point when it argues that Svendborg's mitigation of damages does not now entitle it to detention damages. Although Svendborg mitigated its *detention* damages as much as possible under the circumstances, it could not completely avoid those damages. It could not have reduced the amount of time necessary to effect repairs any more than it did, without suffering lost freights as well. And we do not require Svendborg to suffer—in addition to repair delays—lost freights on the collision charter (i.e., lost profits) just to show its entitlement to detention damages. Such a rule would *discourage* mitigation of damages! Svendborg chose the most efficient route it could: it avoided lost freight on both the collision charter and the subsequent charter by repairing the vessel in the 10-day period that Svendborg created to encompass the repair time.

We find no error, and certainly not clear error, in the district court's award of detention damages to Svendborg for the vessel's 6.6 days of repair-related delay caused by Gulfgate.

B. Travel Expenses

The district court initially awarded $5,090 in travel expenses to Svendborg. In its Order and Reasons granting Gulfgate's motion for new trial in part, the district court amended its judgment to delete the $5,090 award of expenses for Svendborg's technical personnel to travel from Denmark to New Orleans to survey the damage to the vessel. Noting that Svendborg had hired a local surveyor, the court concluded that Svendborg had not established the need for a second survey and could not recover the transportation costs of its "unnamed owner's representative." Svendborg argues that the court erred in denying this proven, reasonable expense that proximately resulted from the collision, insisting that the damage to the high tech specialized vessel was significant, and that the services of its naval architect were necessary to ensure a safe, cost-effective repair.

Substantively, travel expenses are recoverable as damages,[21] but the question is whether the

---

[21]*Gulf Oil Corp. v. Panama Canal Co.,* 481 F.2d 561, 572 (5th Cir.1973); *Reliable Transfer Co. v. United States,* 1973 A.M.C. 930, 933 (E.D.N.Y.1973). The party at fault bears the cost of damage surveys like any other actual damages. *Valley Towing v. S.S. AMERICAN WHEAT,* 1981

costs incurred were necessary. Regardless of the applicable standard of review, the "finding" that these damages were not necessary, producing the concomitant reduction of the amount of judgment, is neither clearly erroneous nor an abuse of discretion. Svendborg does not call the court's attention to the fact that *two* inspections occurred, and cites no evidence in its brief as to why it was necessary to have two inspectors survey the extent of damage. Svendborg does not introduce evidence that it relied on the foreign inspector's advice over the local inspector's advice. Svendborg also cites no *authority* that would allow recovery of travel expenses of *two* persons performing the same, duplicate function. In fact, case law supports the opposite position: owners are not entitled to recover the costs of duplicate surveys.[22] Either under a clear error[23] or abuse of discretion[24] standard of review, then, the district court did not err in amending its judgment to delete the award of $5,090 in travel expenses.

C. Interest Rate

The district court chose the lower federal interest rate to apply to prejudgment interest (a discretionary decision[25]) because Svendborg had suffered no hardship without the interest monies. Svendborg first argues that "hardship" is not to be considered by the court; and then asks that we take notice that the commercial interest rate at the time of the collision (1989[26])—which would have applied had Svendborg had the money to invest—is much higher than the rate (on the date of final judgment, November 30, 1992) chosen by the court. Therefore, Svendborg posits, selection of the lower rate resulted in a gross inequity.

---

A.M.C. 445, 451 (E.D.La.1979).

[22]*International Union Lines v. Interstate Towing Co.,* 1982 A.M.C. 2230 (E.D.La.1980).

[23]In a bench trial, the assessment of damages is reviewed for clear error.

[24]Gulfgate argues that abuse of discretion is the standard of review.

[25]*Reeled Tubing, Inc. v. M/V CHAD G,* 794 F.2d 1026, 1029 (5th Cir.1986).

[26]Evidence that interest rates were higher: The T-Bill rate at that time was 9.517, but in November 1992 it was 3.76%; the Louisiana rate was 11.57 in 1989 and 9.007 in November 1992.

The district court held specifically that *Pillsbury Co. v. Midland Enterprises, Inc.*[27] controls the rate of prejudgment interest to be awarded. As there was no evidence that Svendborg borrowed money, or was prevented from paying off loans because of the casualty, and as the pertinent facts—neither party was domiciled, incorporated, or had its principal place of business in Louisiana—mitigated against applying the Louisiana rate, the district court awarded prejudgment interest at the federal rate. In the court's view, the federal rate, tied to rates of investment return, more accurately compensated Svendborg for the loss Svendborg has suffered.

We have upheld an award of prejudgment interest at a lower rate when no inequity has been shown.[28] As Svendborg has not demonstrated inequity, we conclude that the district court did not abuse its discretion in awarding prejudgment interest at the lower, federal rate.

III

CONCLUSION

For the foregoing reasons we find no error in the district court's award of $144,909.86 in detention damages to Gulfgate. We agree with the district court's conclusion that travel costs totalling $5,090 for a second naval architect to conduct a second inspection were not necessary expenses. And we find no abuse of discretion in the district court's award of prejudgment interest at the legal rate established under 28 U.S.C. § 1961. The judgment of the district court is in all respects

AFFIRMED.

---

[27]715 F.Supp. 738 (E.D.La.1989), *aff'd,* 904 F.2d 317 (5th Cir.), *cert. denied,* 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990).

[28]*Reeled Tubing, Inc.,* 794 F.2d at 1029.