MARINE OFFICE OF AMERICA CORP., et al.

v.

M/V VULCAN, et al.

Nos. 92–456, 92–3241 and 94–2196.

United States District Court,
E.D. Louisiana.

June 13, 1995.

Robert Burns Fisher, Jr., Derek Anthony
Walker, L. Havard Scott, III, Mark Lewis

Gundlach, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, LA, for Asland Cement Corp., Inc. and Lafarge Corp. in No. 92–3241.

Jeffrey Allen Raines, Alan Robert Sacks, Sacks & Raines, New Orleans, LA, for River Const. in No. 92–3241.

Maurice C. Hebert, Jr., Georges M. Legrand, Hebert, Mouledoux & Bland, New Orleans, LA, for Commercial Union Assur. Co. PLC, Sirius Ins. Co. (UK) Ltd., London & Hull Maritime Ins. Co. Ltd., Indemn. Marine Assur. Co. Ltd., Northern Assur. Co. Ltd., Yorkshire Ins. Co. Ltd., Orion Ins. Co. PLC, Prudential Assur. Co. Ltd., Minister Ins. Co. Ltd., Ocean Marine Ins. Co. Ltd., Sphere Drake Ins. Co. Ltd., Cornhill Ins. PLC, Hansa Marine/Vesta Ins. Co. (UK) Ltd., Norwich Union Fire Ins. Soc. Ltd., Bishopsgate Ins. Co. Ltd., Assicurazioni Generali S.P.A., Marine Ins. Co. Ltd. and La Reunion Francaise S.A. in No. 94–2196.

John D. Sileo, Bernard, Cassisa & Elliott, PLC, Metairie, LA, for River Const., Inc. in No. 94–2196.

## ORDER AND REASONS

JONES, District Judge.

The evening of February 26, 1991 was disrupted by the crash of the moving vessel M/V VULCAN into the HISPAMAR, a vessel moored at the Perry Street Wharf in New Orleans. The VULCAN, owned by Rondel Shipping Ltd., ("Rondel"), also damaged Barge MPR–104.

The VULCAN's owners admitted fault, yet the crash gave rise to numerous claims by several parties. Most of the claims were settled or otherwise resolved prior to trial. The issues remaining were tried in a bench trial which centered on damages, specifically, whether the owners of the HISPAMAR, Asland Cement Corporation ("ACC"), properly mitigated damages during the repair process, and whether ACC is entitled to compensation for missing an opportunity to fulfill a contract in Spain. The matter of punitive damages was severed from the trial.

For reasons more fully stated below, the Court finds that the plaintiff mitigated its damages and is entitled to recover reasonable repair costs, but the plaintiff has failed to show that loss of use damages are due.

This decision constitutes the findings of fact and conclusions of law required under Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### I. Repairs

In an effort to show that the plaintiff failed to mitigate damages, Rondel questioned the propriety of taking the bid of River Construction ("River"), and the expedience and competence of repairs.

### A. Bidding

A preliminary field survey of damages was completed on February 27, 1991 by Ben Haveman of Technical Maritime Associates, who was certified at trial by ACC as an expert in marine survey and repair. A report was issued on February 28, 1991. (Plaintiff's Exh. 17).

On March 4, the results of Haveman's preliminary survey were sent to repair companies in order to solicit bids for the repair of the HISPAMAR. Repair companies responded with bids the next day, on March 5.

On March 6, the bid responses were taken to Joaquin Targhetta, president of ACC. The lowest bidders were River, at $3.75/pound of steel and American Marine Corporation, ("American Marine"), at $3.41/pound. The price per pound included the cost of steel plus the cost of removing and installing the steel. (Plaintiff's Exh. 20).

Haveman testified that the preliminary survey, on which bids were based, was limited to a damage/cost assessment because at the time of the survey, he was working for underwriters. The bidders were not told that time was of the essence since underwriters are interested in cost alone, whereas owners of vessels generally have an additional interest—the time that has to be expended making the repairs.

By March 6, Haveman was working for Targhetta. Targhetta asked Haveman to obtain time estimates from the bidders.

The River bid estimated 24 days for repair—the shortest repair time of any bidder. River's bid included a 24–hour work day, anchor removal and scaffolding. American Marine did not initially include an estimated time for repairs in its bid.

Acceptance of the American Marine bid would require the HISPAMAR to be moved to American Marine's repair lot through a 74.5–foot–wide lock. The HISPAMAR, normally 71.5–feet wide, was wider than usual because the vessel was given a ½ to 2 degree list to prevent water from entering a tear that was caused by the crash. Even without the list, the vessel would barely fit the one-foot-minimum allowable clearance through the locks. The owners of the HISPAMAR were also concerned that moving the HISPA-MAR several miles would subject its tear to waves created by passing vessels. River Construction could work on the vessel at Perry Street, thereby reducing risks to the HISPAMAR. Despite the concern for the safety of the vessel in transit, bidders were not informed that the vessel had to stay at the Perry Street Wharf. A subsequent discovery of underwater damage indicates that the choice to stay at Perry was wise.

On cross-examination, Haveman testified that he did not understand certain statements in River's bid. These statements included "previously quoted Cost Plus Rates." (Plaintiff's Exh. 20e). William Weidner, president of River Construction, explained that clarifications were subsequently provided to Haveman. River often left terms open to initiate negotiations. Additionally, some matters such as cargo cleaning could not be quantified until damage was examined thoroughly and defined.

On March 11, the River bid was accepted. (Plaintiff's Exh. 20j). Bidders were informed that the River bid was chosen because of the 24–day repair-time estimate and a concern about losing a berth at Perry Street. Perry Street had an office for the HISPAMAR at the wharf, security, and employees.

Bidders were also informed that insurance was a concern. A $25,000 insurance deductible would apply if, during the movement to another wharf, there was an accident. On cross-examination, Haveman admitted that no inquiry was made about the premium for insurance and that another berth rate would actually be approximately $200, not $1,100 as Haveman had estimated. (Plaintiff's Exh. 20j).

Haveman indicated that throughout his career, he witnessed numerous incidents of bids being sent within the same day of an accident. James Matthew, who was certified as an expert in marine survey by Rondel, considered the bidding time to be excessive. Other testimony revealed that the six-day lag between bid receipt and acceptance occurred because the owners took the bids under advisement.

All of River's repairs subsequent to the preliminary survey were charged separately.

Haveman testified that an owner has the prerogative, based on all considerations, to pick a reasonable bid, not necessarily the lowest bid. The defendant's witness, Matthew, acknowledged that in his career, he endorsed bids that were not the lowest.

B. Damage During the Repair Process

Weather was a factor in the repair process. River conducted repairs outside. Rain fell hard enough to stop work on approximately 24 to 28 days during the period the vessel was under repair. From March 13, 1991 to May 13, 1991, 22.14 inches of rain fell. The normal rainfall for that period is 9.64 inches.

When it rained excessively, welding had to be suspended outside, and work was delayed. While conflicting testimony was offered, the Court finds that welding in the rain is not safe.

On April 14, a rain storm brought high winds and thunderstorms to the New Orleans area. A meteorologist for River Construction testified that thunderstorms nearly always create wind gusts that are extremely non-uniform. On the 14th, winds in the Perry Street area could have been as high as 50 nautical miles per hour. The protective tarps that covered the hole in the HISPA-MAR's side blew off in the storm, exposing cargo and equipment. The tear in the HIS-PAMAR had been widened by River to effectuate repairs.

The rain damaged equipment and caused the cement cargo to crust over and harden. (Plaintiff's Exhs. 17d, 19g). Cement also had hardened as a result of the VULCAN's anchor ripping open the HISPAMAR on the night of the collision. The cargo was subjected to humidity.

Haveman considered River's use of tarps and the welding of a steel lip to the top of the vessel to be prudent and customary. Matthew testified that plastic or flame retardant tarps could have also been placed on the cargo itself.

## C. Expedience and Competence of Repairs

In addition to challenging liability for rain damage, Rondel challenged the repair methods used and the time taken to complete repairs.

Repairs began on March 14. The time between March 11 and 14 was spent on activities including securing a floating crane, obtaining welders, rearranging cargo, cleaning the holds, setting up equipment, ordering steel and materials, and removing the VULCAN's anchor from the side of the HISPAMAR. On March 15, a one-day operation to turn the vessel was completed so that gashes in the ship could be repaired on the shore side. Steel cutting began on March 18, 20 days after the accident.

Weidner testified that opening the vessel up by cutting out large chunks of damaged steel was customary and fast. River consulted a naval architect who determined that the structural integrity of the vessel was not impaired by this method of repair. The Court was not persuaded by Matthew's testimony that conducting repairs by sections was customary and would have protected the cargo from weather damage.

River obtained a gas free certificate that should have assured River that there was no danger of fire during welding. Nevertheless, two to three days were lost when slag fell and came in contact with oil on the floor of the engine room, starting a fire. A temporary floor was built to catch the slag. Fire watchers were employed and asbestos sheeting was used.

From March to October, additional damage was found. The need for inspections and approvals prior to repair of such damage delayed work on several occasions. Haveman testified that some damage could have been examined earlier.

Approximately 26,000 pounds of additional steel was needed for the additional repairs. Steel could only be purchased in certain standard sizes and shapes, causing some steel to go unused. It is also not unusual to charge a higher rate of steel for repairs that are newly discovered. The price per pound increases because labor is spread over less pounds.

Haveman postulated that theoretically, more repairs could have taken place simultaneously, but more manpower would be needed, making simultaneous repair a practical impossibility. Matthew had suggested that internal and external damage should have been repaired simultaneously with other repairs. On cross-examination, he admitted that his criticism of the repairs was not in his original report. (Plaintiff's Exh. 1, pp. 59–76). He agreed that the damaged hull exposed the cement cargo to moisture, and that some internal damage was hidden by cargo. Matthew admitted that it was common to find more damage after repairs began.

Eventually, some cargo was removed. (Plaintiff's Exh. 18). Haveman testified that initially it would not have been reasonable to transfer or remove all of the cargo to survey the damage because it was not known where and if there was other damage.

Targhetta felt that it was prudent to leave the cargo in the holds, in part because by the time of the collision, the equipment to move the cement had been packed away for the vessel's departure from New Orleans. The cheapest alternative was to dump some cargo rather than rent a pump. Loss of cargo from dumping or damage totalled more than $50,000. (Plaintiff's Exh. 1, p. 89).

Because repairs were delayed, the HISPAMAR was at the wharf longer than was anticipated. Eventually, the vessel was moved once on April 19 and once on May 2, each move taking one day. The moves were required to make room on the wharf for a large coffee shipment, and to make room for a priority vessel. A move to the Thalia Street wharf took several days. Each move required that equipment be dismantled and reassembled. Despite Targhetta's claim that

the River bid was taken in part to avoid the cost of insurance, trip insurance was never taken for these moves.

Damage to the wharf was noted and repaired. These damages included replacement of damaged piles. (Plaintiff's Exh. 17e). In October, a report outlined a number of insignificant repairs. (Plaintiff's Exh. 21). Haveman admitted that there was no reason why they were not completed earlier.

A watchman was necessary to check vessel moorings, and to run generators periodically to keep them operational. Additionally, there was a charge for electricity because it was not available wharfside at Perry Street.

Services were provided to the HISPAMAR that included inspecting the vessel, and generator care. (Plaintiff's Exh. 6).

By mid-July, the significant repairs had been completed. (Plaintiff's Exh. 1, p. 3). Approximately 170,000 pounds of steel were used by the time all repairs were completed at the end of October.

## II. Contract in Spain

ACC seeks damages not only for loss of a contract, but also for matters including towage and towage insurance that allegedly would have been paid by the lessee, had a Spain deal not been delayed and ultimately cancelled due to the collision and repairs.

Before the HISPAMAR was hit, the vessel was in the process of a load out. The process involved dismantling and loading equipment in preparation for its departure from New Orleans. The load out was scheduled for completion between February 26–28. After the load out, additional work was to be completed to return the dock to its original condition prior to the arrival of the HISPA-MAR in New Orleans in 1988. The vessel had been permanently moored at the Perry Street Wharf in 1988 to create a market presence in the Gulf.

Sally Fletchinger, comptroller/treasurer at ACC, testified that arrangements for the load out included procuring insurance and the sale of certain items. River Construction was hired to conduct the load out.

Because of the load out, the Perry berth was not renewed annually, as usual, on February 28. The day before the collision, a 45–day extension for the berth was granted by port authorities to allow time for the vessel to complete the load out and to leave New Orleans. (Rondel's Exh. 48). The load out work was interrupted by the collision. Testimony of several witnesses revealed that after the load out, the vessel's intended destination was likely Spain or the West Coast.[1]

At the time of the collision, ACC was a Delaware corporation with its principal place of business in New Orleans. ACC was owned by Asland Catalunya y del Mediterraneo (Cymsa), a Spanish company listed on the Barcelona and Madrid stock exchanges. Cymsa was owned 72.6% by Asland S.A., a Spanish multinational whose shares were traded on the Madrid stock exchange.

Jaime Alabart, the financial and economic director of Asland S.A., testified that in 1991, Asland S.A. was a holding company associated with approximately 20 other companies located in Spain and abroad. The companies were completely independent, with their own accounts and management. The foreign subsidiaries had greater independence. They chose their own banks, management and external auditors. All transactions in Spain were monitored by the Spanish security exchange. ACC was Asland S.A.'s subsidiary in the United States. Loans were given to ACC which were approved by Spanish authorities. ACC repaid the loans with interest. In 1989 Lafarge Coppee, a French

1. In January, prior to the collision, Fletchinger was only aware that the HISPAMAR was going overseas. In late February, Weidner believed that the HISPAMAR was to go to Spain. On March 6, Haveman was told that the owners of the HISPAMAR intended the vessel to be sent to Spain. The possibility of a West Coast trip was mentioned much later. Matthew also heard that the vessel was going to Spain or the West Coast. In late February, Joaquin Sampedro testified that he became aware that the vessel was going to Spain from Gerardo Campa, who managed cement operations on the vessel. Campa sold his New Orleans home and sent his family to Spain in anticipation of the HISPAMAR's move to Spain. After the collision, Campa had to stay in New Orleans. Retaining him in New Orleans was cheaper than contracting a company to maintain the vessel.

multinational, acquired direct or indirect control over 54.6% of Asland S.A.'s share. American authorities scrutinized the takeover and noted no irregularities. Lafarge shares were traded on the Paris stock exchange.

Fletchinger testified that ACC conducted and controlled its own affairs. Specifically, ACC's tax returns were in the company name. Financial statements were audited and approved by outside accountants. ACC had its own separate checking account. Funds were never commingled between parent and subsidiaries, and all corporate formalities were observed. Cement was purchased from a subsidiary in conformity with general accounting principles without overreaching or dictating from the parent company.

On cross-examination, Alabart conceded that at least two members of the board at ACC were managers from Asland S.A. Several managers had moved in and out of positions between the companies. Alabart had access to monthly statements of affiliates because he requested statements from companies that were in the same or related business of cement manufacture.

The HISPAMAR was purchased by ACC in 1988 from a subsidiary. Affiliates provided start-up capital for the New Orleans operation. During the HISPAMAR's operation in New Orleans from 1988 to 1990, approximately $7 million was lost.

As early as 1988, offers existed to buy or lease ACC's inventory or the HISPAMAR. (Plaintiff's Exh. 37). By late 1990, Asland S.A. wanted to use the HISPAMAR in order to take advantage of a prosperous climate in Spain that was fueled by the Olympics and the World Expo. The market for cement in Spain had increased 17–18%. A study prepared by Cementos Asland, dated January 3, 1991, detailed the feasibility of bringing the HISPAMAR to Spain. (Plaintiff's Exh. 36a).

The HISPAMAR is a non-self-propelled floating cement vessel designed to receive, store, bag and deliver cement. Alabart described the vessel as a strategic asset because it could be moved into a market faster and more economically than a factory could

be built. Also, the sea was the primary and only economically feasible method for transporting cement in southern Spain. The HISPAMAR could be used to cut off inroads that foreign competitors made into Asland S.A.'s domestic market. Additionally, only vessels built in Spain could acquire the Spanish flag. As a result, the HISPAMAR was the only floating cement silo in the world that could be operated in Spain.

Government statistics would later reveal that the market was declining, but Asland had based its predictions on market growth for 1991, a time when the market appeared to be growing. ACC would not be affected by an actual market decline if a contract fixed the price. Any loss would fall on the Spanish corporation leasing the HISPAMAR.

Alabart and Targhetta discussed the feasibility of using the HISPAMAR in Spain by telephone and by letters dating from late 1990 to early 1991. A letter dated January 15, 1991 confirmed the contents of several conversations, namely the approval and acceptance of an alleged contract. (Plaintiff's Exh. 36d).

Later discussions set the date of departure at the end of February. The lessee was to pay the towage to Spain, towage insurance and maintenance and operation costs. The agreed price was to be 200 million pesetas per year, or $5,000 to $5,100 per day for one year.

Alabart claimed that no written contract was needed in Spain because the foreign exchange authorities would be given information concerning the transaction. The January letter did not clarify which subsidiary would be lessee of the vessel although the parties felt sure that it was either the Cementos or Catalunya subsidiaries. Alabart testified that Asland S.A. would determine which subsidiary would lease the HISPAMAR. Targhetta explained that the identity of the lessee was contingent on which company would supply the cement.

On cross-examination, Targhetta discussed a letter in which Targhetta informed Lafarge that ACC would not lease the HISPAMAR. Despite the existence of the alleged lease, Targhetta wrote that a sale was the only

acceptable use of the HISPAMAR. (Rondel's Exh. 20). Targhetta explained that by January 14 plans were set regarding the lease in Spain, but Targhetta merely wanted to hear the final offer from Lafarge since the lease in Spain was really only a temporary, one-year solution. If there had been a good offer for sale, Targhetta would have taken it.

On February 4, 1991, Asland was copied on a letter where Targhetta discussed his intent to negotiate with Lafarge about the sale of the HISPAMAR. (Rondel's Exh. 22). In the same correspondence, Targhetta stated that the load out began so that the vessel would be ready for towage to a final buyer in Canada or Washington, even though the vessel was allegedly already leased to a Spanish corporation. At least twice in February 1991, Targhetta was still trying to get a price for the sale of the HISPAMAR from various companies, despite the alleged commitment to a charter in Spain. (Rondel's Exhs. 22, 24).

Towage bids and inquiries on dockage and insurance concerning places other than Spain occurred after the alleged lease agreement was made. (Rondel's Exhs. 23, 25). Targhetta explained that he never put down the final, exact destination of a vessel in correspondence in order to hide the destination of the vessel from competitors.

After the collision, the parties thought that the vessel would still arrive in Spain on time. With one month needed to cross the Atlantic and two to three weeks to have the floating cement silo operational, it became apparent that the June 1 target date would not be met. It would not be economically feasible to lease the vessel for less than one year, primarily because of towage and premium costs. Further, some of the May to September months, where most cement is used, would be missed. By April 15, the alleged lease was cancelled orally.

ACC claims that as a result of the loss of the HISPAMAR contract, the Spanish company lost sales in Spain. In May, River was told that time was no longer of the essence in confecting repairs, but no consistent and convincing evidence was presented to indicate that, at least through mid-July, repairs slowed down appreciably.

After the collision Targhetta continued trying to lease or sell the vessel. (Rondel's Exhs. 31, 33, 38). The vessel was kept in New Orleans to avoid the expense of winter towage and towage insurance. In June 1991, an offer of $3.5 million was made on the HISPAMAR. (Rondel's Exh. 32). However, Targhetta explained that the offer was never made directly to ACC but instead to Lafarge.

While the vessel remained in New Orleans, maintenance and operational costs were incurred including the continued employment of Gerardo Campa, who checked the vessel's mooring lines and equipment. Other costs included employee expenses, vessel insurance, diesel and other supplies, wharfage, harbor fees, dockage and security.

An April 1991 letter discussed a lease price of $1 million per year. The would-be lessor considered the price too high for that type of barge considering that seven similar vessels in the world were unemployed at that time. (Rondel's Exh. 31).

Eventually, the HISPAMAR was sold in May 1992 to Catalana de Cementos Portland for more than $6.4 million. Some proceeds from the sale were spent to pay debts. (Rondel's Exhs. 43, 44). Approximately $2.6 million in proceeds was paid to a broker in return for its contract to sell the vessel within a specified period. Alabart testified that urgency was probably the rationale behind the large commission.

The vessel was moved to Spain in the spring of 1992, followed by the sale of the vessel for $2 million one year later, to Turkey. After six months in Turkey, the vessel returned to Spain, where it remained unemployed at the date of trial.

The value of the HISPAMAR has varied from its 1992 sale price of $6.4 million. Prior to the collision, the vessel was insured for $5 million. In March 1990, an offer was received to purchase the vessel for $2 million. (Rondel's Exh. 5). The vessel was purchased by ACC in 1988 for $2 million. Alabart testified that the value of the HISPAMAR was not solely measured in profits. The vessel was quickly brought into areas to

break-in a market area, or to stop competitors from entering an area.

### III. Damage Calculations

Harold Asher, the defendant's expert witness in accounting and damage calculations, disallowed losses for certain items including fire watch, cleaning, and towage between the Perry and Thalia Street Wharves. He felt that these items should not have been separately invoiced. Instead, the charges should have been included in River's bid, as American Marine had done in some instances.

Asher further disallowed damages stemming from rain loss and loss of use. Asher disallowed operational and administrative expense claims for items including insurance, personnel, security services, and dockage fees. He testified that had a June offer for sale of $3.5 million commenced, there would be no later damages. Asher concluded that the total loss should be $578,600.49. From what the insurers had paid ACC, approximately $4,000 remained in unreimbursed damages. On cross examination, it was revealed that Asher failed to include as damages, the $50,000 in deductibles that ACC paid.

Asher indicated that industry guidelines dictated that when a lease was not written, an allowance for a loss is not made. He found that plants in Spain could provide the necessary cement output without the HISPAMAR. Asher suggested that the report relied on by Alabart demonstrated that parties would use the HISPAMAR as a storage vessel, which was an underutilization of a unique asset that has greater capabilities.

Asher criticized the Spain–ACC contract as economically unlikely, but he admitted that he was not familiar with the economy or the infrastructure of Spain. Alabart testified that Asher was assuming that the same market factors existed in Spain as in the United States.

### CONCLUSIONS OF LAW

This Court has jurisdiction pursuant to 28 U.S.C. § 1333.

Throughout the trial, ACC presented no evidence of negligence or breach of contract by River. ACC instead presented testimony that it was satisfied with River's work. ACC explained that River was sued by ACC because of Rondel's allegations that repairs were negligent. In its motion under Rule 52(c) of the Federal Rules of Civil Procedure for judgment on partial findings, River argued that repairs were adequate, reasonable and prudent, and that delays from finding additional damage, rain, and fire were beyond the control of River. The Court agreed that evidence of negligence was lacking and that ACC did not meet its burden of proof regarding negligence by River. River was dismissed.

### I. Repairs

■ A vessel owner is entitled to recover the full cost of reasonable and necessary repairs to its vessel from the vessel owner at fault in a collision. *Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa,* 761 F.2d 229, 233 (5th Cir.1985). If the injured party acts reasonably in repairing damage, it may recover fully from the tortfeasor. *Id.* Rondel admits fault, but alleges that the plaintiff failed to mitigate its damages. The burden to show the failure to mitigate is on the wrongdoer. *Continental Sweden Corp. v. MP Howlett, Inc.,* 719 F.Supp. 1202, 1210 (S.D.N.Y.1989).

Rondel asserts that the plaintiff's duty to mitigate damages suggests that the lowest bid is the reasonable and appropriate bid. *E.I. Du Pont de Nemours & Co. v. Robin Hood Shifting & Fleeting Service, Inc.,* 899 F.2d 377, 381 (5th Cir.1990). This general rule is subject to qualification. Because matters such as time are not quantified in the price-per-pound bid, and because the bidders included and excluded different items within the bids, the Court is precluded from making a precise comparison of the bids based on numbers alone. (Plaintiff's Exh. 20).[2]

---

**2.** *See e.g., Elgin, J. & E.R. Co. v. American Commercial Line, Inc.,* 317 F.Supp. 175, 176 (N.D.Ill. 1970) (accepting a lower bid would cause a delay that would, in turn, jeopardize the safety of a bridge).

■ The Court was favorably persuaded by River's estimated rapid repair time. More importantly, the HISPAMAR would be at risk if the vessel was transported through locks to the repair yard of American Marine. Given these factors, and the fact that River already had workers and equipment on site from the load out, the acceptance of the River Construction bid was reasonable. Additionally, the bids were requested and acted upon within a reasonable time given that deliberation was needed to react to the large tears in the HISPAMAR. Insurance, dock space, time, costs, and safety were only some of the considerations that faced the owner of the injured vessel. Delays during the repair process are not unusual. *Standard Marine Towing Services, Inc. v. M.T. Dua Mar*, 708 F.Supp. 562, 566–67 (S.D.N.Y.1989); *Continental Sweden* at 1215.

■ Rondel also challenged the care given to cargo and the decision not to remove cargo from the vessel immediately after the collision. River is held to a standard of due care in its protection of the cargo entrusted to it. *Rodi Yachts Inc. v. National Marine, Inc.*, 984 F.2d 880, 885 (7th Cir.1993). Credible testimony established that River's use of tarps and a steel lip met the standard of due care. Damages attributable to delays, (Rondel's Exh. 64), or weather are reasonably foreseeable consequences of the initial damage caused by the VULCAN. *Standard Marine* at 566. *Continental Sweden* at 1210. Further, testimony was presented that the nonremoval of cargo was in due care and reasonable at the time.

ACC made payments for towage of the vessel during the repair period.[3] Rondel claims that towage could have been avoided if the vessel was taken to American Marine's repair lot. As stated, when River was chosen, towage was considered unsafe. Moreover, towage during the repair period could not have been predicted and thus prevented because the vessel was under repair longer than anticipated.

Having found River's bid reasonable, the Court declines to compare and deduct expenses based on American Marine's ability to conceivably have completed repairs at a faster pace or lower rate. The Court cannot speculate that American Marine would have experienced less delays or repair problems than those experienced by River.

After a reasonable choice of a repair company is made, further consequences of that choice, such as subsequent damages or delays, flow from the collision.[4] *Continental Sweden* at 1210. The party whose wrong forced the choice cannot complain of the consequences, with the benefit of hindsight, once a reasonable choice is made. *Ellerman Lines, Ltd. v. The President Harding*, 288 F.2d 288, 290 (2d Cir.1961).

## II. Contract

■ An injured party may recover loss of earnings, use or profit during the time that a damaged vessel is out of use as a result of a collision, provided that the profits can be proven with reasonable certainty. *Johnson v. Otto Candies Inc.*, 828 F.2d 1114, 1119 (5th Cir.1987). A contract can measure loss. *Delta Marine Drilling Co. v. M/V Baroid Ranger*, 454 F.2d 128, 130 (5th Cir.1972).

ACC tried to establish that an oral agreement was quietly entered into between it and a Spanish corporation.

■ It is true that oral maritime contracts are permissible, *Kossick v. United Fruit Co.*, 365 U.S. 731, 734, 81 S.Ct. 886, 889, 6 L.Ed.2d 56, *reh'g. denied* 366 U.S. 941, 81 S.Ct. 1657, 6 L.Ed.2d 852 (1961), and secrecy may surround a charter agreement. *Continental Sweden* at 1208–09. Additionally, contracts between parents and subsidiaries, for purposes of damages, are permissible contracts so long as the rate is fair, corporate formalities are observed, and there is no overreaching by either party. *Moore-McCormack Lines, Inc. v. The Esso Camden*, 244 F.2d 198, 202–03 (2nd Cir.1957), *cert. denied* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 37 (1957).[5]

---

3. Rondel claimed that the towing charges were excessive because American Marine would have provided towing to its yard for only $16,000.

4. Apparently, ACC was due a $5,000 credit for a timely payment. (Rondel's Exh. 62). That River did not provide its discount as promised is a consequence of the collision that the defendant must bear.

5. Many of the corporations affiliated with ACC had common corporate officers, had shared, sub-

■ Notwithstanding the law's recognition of contracts between related companies, secrecy, and maritime oral contracts, the Court finds it unbelievable that the $5,000–a–day, year-long contract was not reduced to writing. The letter of January 15, 1991 states that the agreement was to be formalized by a lease, but the lease was never written. The letter sets the price and length of an agreement, but fails to indicate the identity of the lessee. The letter states that "[t]he lessee could be Asland, S.A., or any of its subsidiaries in Spain." (Plaintiff's Exh. 36d). The lack of an essential contract term in this letter and subsequent telephone arrangements is fatal to the formation of the contract. ACC contends that a charter exists here because a "charter is formed as soon as the traditional elements of a contract are present, such as consideration, offer and acceptance, mutuality of assent and parties competent to contract." *Williston on Contracts*, 3rd Edition § 1072 at p. 26. In the case at bar, no offer, acceptance or mutuality of assent could exist because there were no certain parties to engage in these activities.

Moreover, ACC's negotiations with other companies continued after the alleged agreement was made despite ACC's obligation to be bound by the lease.

The facts and circumstances surrounding the formation of the alleged contract indicate that no contract was formed. Instead, the parties were engaged in preliminary negotiations concerning an unidentified lessee.

■ Still, ACC argues that even if it failed to prove the existence of a bound agreement, damages are payable. Profits may be reasonably supposed to exist if the vessel was active in a ready market. *In re M/V Nicole Trahan*, 10 F.3d 1190, 1194 (5th Cir.1994), *reh'g. denied*, 1994 U.S.App. LEXIS 3477 (5th Cir. Feb. 7, 1994).

■ ACC maintains that the HISPAMAR was capable of earning at least as much as it would have been paid by the Spanish corporation.

Offers for the vessel existed, but the telling facts are that there were no profits at any time that ACC owned the vessel. The Court declines to award loss of use damages where there was no ready market shown and there were no profits. The HISPAMAR had not been engaged in profitable commerce and was not in any realistic, immediate demand so that profits could reasonably be supposed to have been lost. The method to determine detention damages is to seek the profit average based on a number of voyages before and after the collision. *Id.* Here the average is zero.

■ ACC emphasized the HISPAMAR's non-quantifiable, valuable characteristics. The vessel was particularly valuable in Spain, where silo storage is required rather than warehousing, and where the HISPAMAR was capable of obtaining a Spanish flag.[6] However, the potential value of the vessel never grew beyond potential.

■ The Court cannot award damages for the vessel's ability to open markets or drive off would-be competitors. The plaintiff provided no method to make such a calculation and such damages are uncertain and speculative. *In re Nicole* at 1194; *Standard Marine* at 564.

### III. Damage Calculations

The plaintiff's witness, Richard Wood, was certified as an expert in claims consultation. He completed a statement of loss and damages to which he made extensive adjustments during his testimony. The loss calculations included what he believed were all charges reasonably related to the collision. Such figures generally will not be the same as that

---

stantial identity of ownership, and pursued similar business functions. The Court finds that the relationship between ACC and related companies is close, but declines to consider the companies as a single business entity because the determination is not necessary to resolve the issues in this case. *See Green v. Champion Ins. Co.*, 577 So.2d 249, 257–58 (1st Cir.1991), *cert. denied* 580 So.2d 668 (La.1991) (discussing corporations functioning as a single business enterprise).

6. ACC contends that the special characteristics of the HISPAMAR make it a special purpose vessel where market value is not readily determinable. In these cases, other factors including replacement costs, depreciation, expert opinion, and the amount of insurance on the vessel can be used to determine the value of a vessel. *E.I. DuPont* at 380. *See Greer v. United States*, 505 F.2d 90 (5th Cir.1974).

paid out by an insurance company because the policy terms may not include all costs or recoverable losses, such as that amount not paid by insurance due to a deductible. The HISPAMAR's insurers paid $571,741.39. (Plaintiff's Exh. 1, p. 119).

The hull and cargo damages, operational and administrative expenses, towage and loss of use in Wood's report totalled more than $3 million. Given the findings of fact and conclusions of law in this opinion, the Court hereby finds the damages as follows:

|   |   |   |
|---|---|---|
| I. | Loss of Use | $0 |
| II. | Hull & Cargo Damage | $964,042.05 |

The figure reflects a reduction of $9,796.00 to account for the cost of anchor removal, which the parties stipulated was included in River's bid and should not have been separately invoiced. The figure $964,042.05 also reflects an increase of $6,900 for certain replacement equipment that was erroneously excluded from the report.

|   |   |   |
|---|---|---|
| III. | Towage Expense | $0 |

Having found that no lease existed, the Court cannot require the defendant to pay certain towage expenses to Spain on the plaintiff's rationale that the charterer would have paid this expense had the collision not interfered with the commencement of the charter.

|   |   |   |
|---|---|---|
| IV. | Operational & Administrative Expenses | $133,258.92 |

The plaintiff may recover expenditures incurred while the vessel was under repair. *Standard Marine* at 568. Recoverable costs include surveyors, port captains who protect the vessel and oversee repairs, and general expenses. *Id.* Maintaining necessary personnel is recoverable, as well as insurance and prejudgment interest. *Id.* at 568–69. Having found that no charter existed, certain out-of-pocket operational and administrative expenses requested by the plaintiff will not be payable after vessel repairs were largely completed on July 19, 1991. (Plaintiff's Exh. 1, p. 3).[7] The parties reached a partial stipulation that these expenses totalled $92,596.42. (Rondel's Stipulation Letter, May 31, 1995).

The Court declines to award an additional 30 days of administrative and overhead expenses pursuant to ACC's request. (Plaintiff's Stipulation Letter, May 30, 1995). The expenses are largely towage related, appear to overlap with such expenses, and for the most part could be conducted simultaneously with repairs, eliminating the need for security and other related expenses. Likewise, overhead and administrative expenses resulting from three days of repair in October are unduly attenuated from the date of the accident, would likely be incurred anyway, and could have been completed simultaneously with other repairs. Moreover, one aspect of this claim is attributable to attending to "prospective buyers," which is not collision related. (Plaintiff's Exh. 6m).

The insurance expenses were shown with the requisite specificity required for recov-

---

**7.** The Court declines to cut off such damages at an earlier date in June, when ACC allegedly indirectly received an offer to purchase the vessel in exchange for $3.5 million. The subsequent sale of the vessel for more than $6 million indicates that ACC made a prudent business decision not to sell the vessel earlier. Moreover, Targhetta testified that no offer was directly made to him and thus he had no offer to accept. Further, although there were indications that River was told that time was no longer of the essence in completing repairs, no consistent or convincing evidence was presented to show that the repair process was appreciably slowed from May to July.

Additionally, the Court declines to assess damages past the July date. The plaintiff's own expert report indicates that the significant collision repairs were completed at that time. (Plaintiff's Exh. 1, p. 3).

ery. (Plaintiff's Stipulation Letter, May 30, 1995). Thus, the Court awards $19,042.50 in addition to the amount reached by stipulation.

ACC incurred costs in preparation for towing that had been completed prior to the collision. This preparation had to be repeated after the collision. Thus, the Court awards $21,620. (Plaintiff's Stipulation Letter, May 30, 1995).

Thus, the Court awards hull and cargo damages of $964,042.05, and operational and administrative expenses of $133,258.92. Prejudgment interest shall be awarded,[8] however, the Court declines to award attorney's fees, costs or disbursements.

### Conclusion

Accordingly,

IT IS ORDERED that the defendant pay the plaintiff $1,097,300.97, representing damages resulting from the collision.*

IT IS FURTHER ORDERED that the defendant pay the plaintiff prejudgment interest dating from the collision, at the rate established under 28 U.S.C. § 1961.

---

8. Prejudgment interest is awarded unless exceptional circumstances dictate otherwise. *In re Bankers Trust Co.,* 658 F.2d 103 (3rd Cir.1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2038, 72

L.Ed.2d 485 (1982), and *on remand,* 569 F.Supp. 386 (E.D.Pa.1983).

* Editor's Note: By order dated June 21, 1995, the hull and cargo damages were reduced by $571,-

---

741.39, reducing that award to $392,300.66 and the overall award to $525,559.58.